# CHARLESTON.

## CRISWELL v. RAILWAY CO.

Submitted June 4, 1887.—Decided February 18, 1888.

1. RAILROAD COMPANY—MASTER AND SERVANT—FELLOW-SERVANT—VICE-PRINCIPAL.

When a railroad company puts a foreman in charge of a gang of laborers with power to discharge them subject to the approval of the supervisor, and makes it his duty to see that these laborers faithfully perform their duty, such foreman must, in the performance of all his duties to those laborers under him, be regarded as the representative of the railroad company; and if, through his neglect of duty, one of these laborers, in the performance of his duty, is injured, such laborer may recover of the railroad company the damages he has sustained, caused by the negligence of such foreman. (p. 818.)

2. RAILROAD COMPANIES—MASTER AND SERVANT—NEGLIGENCE—DUTY OF FOREMAN.

If one of the rules of the railroad company, furnished him for his guidance, provides that "extra trains may pass over the road at any time, without previous notice, and the foreman must be always prepared for them;" and another rule provides "he must run the hand-cars with great caution, and he must not permit them to be used unless he accompany them;" and another rule requires him "to compare his time each day with the clock at the nearest telegraph office, or with the conductor on the train,"—these rules, as well as the law, require him to use the opportunities thus daily afforded, or any other opportunities, to ascertain what trains are expected to run over his section of the track by previous arrangements and when, so that he may be prepared for them as well as he can be, and thus diminish the risk of a collision of extra trains with the hand-car. (p. 820.)

3. RAILROAD COMPANIES—MASTER AND SERVANT.

If he neglects this duty, and, without any fault of one of the

laborers under him, his hand-car comes in collision with an extra train, which, had he performed his duty, would not have occurred, and the laborer on the hand-car is killed or injured, the railroad company will be liable for the damages so sustained.   (p. 821.)

4. RAILROAD COMPANY—MASTER AND SERVANT—NEGLIGENCE—ASSUMPTION OF RISK.

Nor will the fact that the laborer voluntarily got upon the hand-car in very foggy weather, and no flag was sent out in advance, and no precautions taken to prevent a collision, prevent such recovery from a railroad, though the laborer knew these facts and rules of the company, if he had not been informed of such negligence of the foreman.   Such conduct of the laborer, without such information, would be a voluntary assuming on himself only the risk of a collision with an extra train which the foreman could not have ascertained would be on the track and come in collision with his hand-car, if he had used, as he should have done, the opportunity he had of obtaining such information about them.   (p. 824.)

Statement of the case by GREEN, JUDGE:

This was an action on the case, brought by N. C. Criswell, administrator of Thomas Waldron, in the Circuit Court of Ohio county, against the Pittsburgh, St. Louis & Cincinnati Railway Company, a corporation under the laws of this State, for damages resulting from the killing of Thomas Waldron on October 4, 1884, by the collision of a passenger train of this railroad company with a hand-car on the track of this railroad, on which he was traveling, as a hand in the employment of this company, to a place where work was to be done to keep in repair the track of the road.   The suit was brought on December 4, 1884.   The declaration was filed at the February rules, 1885, and contained four counts. At the February rules, 1885, an amended declaration was filed; there being added to the four counts in the original declaration a fifth count, which, as it shows the character of the suit in detail more fully than the other counts in the declaration, I will state at length.   It is as follows:

"*Fifth Count.*   And the said plaintiff further complains and says that whereas, the said defendant, at the time of the committing by it of the grievances as hereinafter mentioned, was in possession of a certain other railroad in the county of Ohio, and of a certain other railroad locomotive steam-engine, and of railroad cars to the last-mentioned engine at-

tached, and also of a certain other hand-car, which said engine, cars and hand-car were then used, managed and controlled by the said defendant, upon the said railroad last-mentioned, at the time last aforesaid, and the said defendant was then and there using, managing, controlling and driving the said engine and cars last-mentioned upon and along the said last-mentioned railroad, and was driving and running the same upon the said railroad last-mentioned towards the city of Wheeling, in the said county of Ohio ; and the said Thomas Waldron, deceased, of whose estate the said plaintiff is administrator as aforesaid, was then and there, being in full life, a servant of the said defendant, by it employed to do certain work and labor upon the said railroad last mentioned, and was by the said defendant licensed, permitted, instructed and required to go and travel upon the last mentioned hand-car, along the railroad last mentioned, at all times, from the said city towards the place upon said railroad last mentioned where the said engine and cars thereto attached last mentioned were then being run and driven on the said railroad last mentioned towards the said city; and it was then and there the duty and obligation of the said defendant to give notice to the said Thomas Waldron, deceased, of all engines, cars, and trains moving and being driven upon the last mentioned railroad towards the said city of Wheeling, and of all obstructions upon the said last-mentioned railroad.   Yet the said defendant, though well knowing the premises, and that the said engine and cars last mentioned were being moved and driven, with great rapidity, along and upon the last-mentioned railroad towards the said city, and without giving to the said Thomas Waldron, deceased, any notice thereof, carelessly, negligently, and improperly allowed, permitted, directed, and required him to go and travel upon the last-mentioned hand-car, along and upon the railroad last-mentioned, towards the place where the engine and cars last-mentioned were being moved and driven as aforesaid, along and upon the last-mentioned railroad, towards the said city of Wheeling; and the said Thomas Waldron, deceased, then in full life, did, as such servant, and in accordance with his duty as such servant, and being wholly ignorant, and without any information from any

source, that the engine and cars last-mentioned were being rapidly moved and driven, along and upon the said railroad, towards the said city, go, proceed, and travel upon the said hand-car last-mentioned, along and upon the said railroad last-mentioned, towards the engine and cars last aforesaid; and the said defendant did then and there carelessly, negligently and improperly wholly fail to notify the said Thomas Waldron, deceased, of the approach towards said city of the engine and cars last-mentioned, as the said defendant ought to have done; and the said Thomas Waldron, deceased, then in full life and vigor, going, proceeding, and traveling thereon with all reasonable care and circumspection, upon and along the last-mentioned railroad, the hand-car last aforesaid was run against, into, and upon, with great force and violence, by the engine and cars last-mentioned, then moving with great rapidity towards and against the hand-car last-mentioned, to-wit, on the 4th day of October, 1884, at the said county of Ohio; by means whereof the said Thomas Waldron, deceased, then in full life, was then and there, with great force and violence, struck, wounded, hurt, and injured, and thrown from the said last-mentioned hand-car to the ground, by reason of which violence, striking, wounding, hurting, and injuring last-mentioned the said Thomas Waldron, deceased, did thereafter, to-wit, on the day and year aforesaid, die. And the said plaintiff says that the carelessness, negligence, default, and wrongful conduct of the defendant last aforesaid was the cause of the death of the said Thomas Waldron, deceased; that the said carelessness, negligence, and wrongful conduct, and default of the said defendant in this count mentioned, and the wounds, hurts, and injuries thereby caused, as hereinbefore in this count mentioned, were such as would have entitled the said Thomas Waldron, deceased, if his death had not ensued, to maintain an action against the said defendant in respect of the last-mentioned carelessness, negligence, default, and wrongful conduct of the said defendant as in this count mentioned; that the said Thomas Waldron, deceased, has left surviving him his widow, Bridget Waldron, and his infant children, John Waldron and Thomas Waldron, who are the distributees of his estate; that this suit is brought for the benefit of

the distributees of the estate of the said Thomas Waldron, deceased, and that, by reason of the premises contained, the distributees of the estate of the said Thomas Waldron, deceased, have been greatly injured, and have sustained damages to the amount of 10,000 dollars; and the plaintiff says that, by reason of the premises, he has been greatly injured, and has sustained a large amount of damages, to wit, to the amount of 10,000 dollars, and therefore he sues," etc.

"DENNIS O'KEEFE and
"W. P. HUBBARD, P. Q."

The declaration, and each count thereof, were demurred to. The plaintiff joined issue on this demurrer. The court sustained the demurrer to the first count, and overruled it as to all the other counts. The first count was very general and brief, and, instead of alleging circumstances, as the other counts all did, showing that, when the accident happened, the plaintiff's intestate had a right to be on the track of the defendant as its employe, it simply alleged that the defendant's servant negligently drove its engine against the plaintiff's intestate, and killed him, not alleging that he was lawfully on the track of the defendant. The other counts have in them substantially all that was essential to make the fifth count good, and were all, except this first count, good, if the fifth count above stated is good.

The defendant pleaded not guilty, and issue was joined on this plea. This issue was tried by a jury on December 24, 1885, who found for the plaintiff, and assessed his damages at $5,000.00. The defendant moved the court to grant it a new trial, and on the 29th of May, 1886, the court overruled this motion, and thereupon rendered a judgment for the plaintiff against the defendant for the sum of $5,000.00, the damages assessed by the jury, with interest from December 24, 1884, and costs; to which action of the court the defendant excepted.

The bill of exceptions sets out all the evidence offered to the jury on either side, all the rulings of the court during the trial, and all the instructions to the jury given and refused by the court. This evidence proves the following facts:

The plaintiff's intestate was in the employ of the defendant as a track-repairer from December 23, 1881, till he was

killed, on October 4, 1885. He was with a gang of four other men, in charge of one Foutz as their foreman, who worked with these men on a section of the defendant's road, six miles in length, extending from the freight depot of the defendant north, on the east side of the Ohio river six miles. The immediate superior of the foreman in that division of the defendant's road was one Kearns, the supervisor of that division of the road, who had to see that Foutz, and also other foremen in his division of the road, kept it in repair, and did their duty as foremen of these small gangs of laborers. He traveled in the trains over that division of the road daily to see that the road was kept in repair; and he furnished to the foremen of these small gangs of laborers, who did the actual work of keeping it in repair, hand-cars, which were under the exclusive control of these foremen. These laborers were under the charge of these foremen, who could suspend them from work, or dismiss them, at any time, subject to the approval of the supervisors of the road in which the short sections of the road were located. So, if Foutz, the foreman of the six miles section beginning at the freight depot and extending northward six miles, removed or suspended any of the gang of laborers,—track repairers,—in his charge, he had immediately to report the case to the supervisor of this division, Kearns. Foutz directed the men in his charge when and where to work, and worked with them. If the distance they had to go to work was as far as the point where this accident took place, on October 4, 1884, was from the tool-house in Wheeling, they always rode on the hand-car, which was in charge of the foreman, Foutz, and kept at the tool-house. He did not order the men in his charge to get on the car to go to their work, but, when he had put on the car, they would get upon it of their own accord, as the plaintiff's intestate did the morning this accident occurred. They could not use this hand-car except with his assent. If they had three or four miles to go in the morning, and did not ride on this hand-car, they would not reach the place where they were to work in proper time. The hand-car moved much faster than they could walk. The plaintiffs intestate lived in the same building with his foreman, Foutz, at the time of the accident. It occurred thus: On the evening of October

3, 1884, a body of men, called "Plumed Knights," wishing to make an excursion to Columbus, Ohio, made, in Wheeling, an arrangement with the authorized agent of the defendant, whereby they were taken to Columbus on the defendant's train the next day; and wishing to return very early Saturday morning, October 4, 1884, to Wheeling, the defendant, by its agent, agreed that there should be run an extra or special train from Steubenville to Wheeling early on the morning of Saturday, October 4, 1884; so that they could get back to Wheeling earlier than they could by the regular passenger train of the defendant coming from Steubenville on that day. Neither Foutz, the foreman of this gang of track-repairers, nor any of the men in his charge, nor the plaintiff's intestate, knew any thing of this arrangement for this special or extra train. The place where this gang of men in charge of foreman Foutz was repairing the road was some four miles from the tool-house in Wheeling. Most of the men in his charge preferred staying in Wheeling on October 4, 1884, to attend some political parade to take place that day; but the plaintiff's intestate, Foutz, and his son, about 15 years old, who lived in the same building, near this tool-house, which is about three-quarters of a mile north from the defendant's freight depot, in Wheeling, where the section of six miles which Foutz, as foreman, with his gang, kept in repair, begins, went from their home a short distance to the tool-house, and there put the hand-car on the track, and got upon it, on Saturday morning, about 6 o'clock, a few minutes after the regular passenger train from Wheeling northward, and over the defendant's road, went up. They had gone about three and a quarter miles from this tool-house, on this hand-car, when the car came in collision with this extra or express train coming to Wheeling from Steubenville.

Neither the officers in management of this extra train, nor any of the parties on this hand-car, saw such collision was about to occur, or apprehended it, until probably a second or two before the engine of the extra train struck the hand-car. This was owing to a dense fog that morning, which prevented a person from seeing more than 10 or 15 yards. The foreman, Foutz, however, saw the train just in time to

jump from the hand-car and save his life; but his son and the plaintiff's intestate did not see the coming train, and remained on the hand-car, which was smashed to pieces, and both of them killed,—Foutz's son instantly, and the plaintiff's intestate had his thigh broken, and died in three or four hours afterwards. The extra train was running at the usual rate of a passenger train, some 35 miles an hour. The agents of the defendant in charge of this train only knew of what occurred by the jarring of the cars, produced by the collision. They had whistled at a crossing by a road across this railroad a half mile north of the place where this accident occurred. There is a diversity in the evidence about how loud this whistle was; some of the witnesses representing it as a very slight whistling, others as louder than usual. The jury, from this finding, I presume, regarded it as so slight that those on the hand-car could not hear it, because of the noise made by the running of the hand-car; or, if they did hear it, they supposed it was the whistling of an engine on a railroad on the Ohio side of the river, there being a railroad there, just across the Ohio river from the defendant's railroad, where whistling was frequently done on about that time of day. The jury doubtless held that those on the hand-car were not guilty of negligence in either not hearing this slight whistling, or not supposing it was the whistling of an approaching train on the defendant's railroad. The cars were stopped as soon as they could be after this collision, and the plaintiff's intestate was taken to the hospital in Wheeling on them, where he died in three hours from the injuries he had received. He was about 45 years of age,—healthy and industrious. He left a wife and two sons, one a child some two years old, and one about fifteen years old.

The rules of the defendant in reference to the duties of foremen of gangs of laborers to repair the road proven in evidence, were as follows:

"394. The track foreman must engage in all work personally, and see that the laborers employed under him faithfully perform their duties."

"397. He may discharge or suspend from duty any employe under his charge, but must report the case promptly

to the supervisor for his approval. He must not increase his force without his consent."

392. He must compare time each day with the clock at the nearest telegraph office, or with the conductor of a train."

"401. He must never obstruct the track in any way whatever, without first conspicuously displaying and using all danger signals at least 900 yards in both directions on single track, and 900 yards in the direction trains are expected on double track. Extra trains may pass over the road at any time without previous notice, and the foreman must always be prepared for them. Anything that interferes with the safe passage of trains at full speed is an obstruction."

A copy of these rules was furnished every foreman of repair hands, and foreman Foutz had a copy of them furnished to him by the defendant. The danger-signal spoken of in these instructions is a red flag. No red flag was used as a signal to prevent accidents on the morning of the 4th of October, 1884, no one being sent forward with such flag in advance of the hand-car; nor was any other precaution taken to prevent a collision with an extra train, no one on the hand-car having any notice of an extra to be run that morning. Extra trains ran over this part of the defendant's railroad, at irregular times, sometimes two or three times a day. By extra trains is meant any train or engine which is run on a special occasion. These trains, over this part of the road, would average about three a week, though they run at very irregular intervals, and only when the interest or requirements of the road demanded it. They are sometimes started with only a half hour's notice to the agents of the defendant that they are to be started. Sometimes the agents starting an extra train as in this case, may have several days' notice when it is to be started.

It was proven that it was impracticable to give notice of the running of these extra trains to the foremen of the gangs of railroad repairers, and that it is not the practice to give such notice to such foremen on railroads generally. It was proven, however, that in the years 1881–82 notices were frequently given by throwing out a note to the foreman as the train passed along, when he was at work with his gang of track-repairers, telling him when an extra train might be

expected; but it is at least questionable whether this was as often done by supervisor of the foreman of the track-repairers as by others whose duty it could not have been, as officers of the defendant, to do so, but who did it of their own accord, as an act of kindness, when it could be done conveniently.

Neither these rules of the defendant above stated nor any others, were ever made known to the plaintiff's intestate, and no proof of his having any notice or knowledge of them appears, unless such knowledge could be inferred from the knowledge he necessarily had of the substance of these rules, or of some of them, from this daily observation of what was done by this foreman who had a copy of them, and except that foreman Foutz testified that he told Waldron and the other hands, at times, that they would have to be on the lookout for specials at any time. They might come at any time. But he said he could not remember any particular occasion when he told the plaintiff's intestate this.

Upon this proof of facts, and this evidence being adduced to the jury, and these being all the material facts or evidence in the case, on motion of the plaintiff, the court gave to the jury the following written instructions:

"*Instruction No. 1.* The jury are instructed that it is immaterial what rules the defendant had adopted, unless they were brought to the knowledge of the plaintiff's decedent, Thomas Waldron.

"*Instruction No. 2.* The jury are instructed that with respect to the question of contributory negligence on the part of Thomas Waldron the burden of proof is on the defendant."

To the giving of each of said instructions, the defendant objected, but the court overruled said objections, and each of them, to which rulings of the court the defendant then and there excepted; and the plaintiff moved the court to give to the jury the following instruction.

"*Instruction No. 3.* The jury are instructed that the defendant was bound to take all reasonable precautions for the safety of the laborers employed by it on its track, including the plaintiff's decedent, Thomas Waldron."

And the defendant moved the court to give to the jury the following instructions:"

"*Instruction No. 6.* The defendant had the right to make such rules and regulations for the conduct of its servants and agents, while engaged in its service, as in its judgment were reasonable or proper, or would conduce to the safety and comfort of its employes; and all servants while engaged in such service with a knowledge of such rules and regulations were bound to act in conformity therewith; and, if the injuries were sustained by them while acting in violation thereof, no recovery can be had of the defendant therefor, if such violation was the cause of, or materially or directly contributed to, such injury."

.The court gave both said instructions together, adding the word "yet" to the defendant's instruction No. 6 at the end of plaintiff's instruction No. 3; so that they read as follows: "The jury are instructed that the defendant was bound to take all reasonable precautions for the safety of the laborers employed by it on its track, including the plaintiff's decedent, Thomas Waldron; yet the defendant had the right to make such rules and regulations for the conduct of its servants and agents, while engaged in its service, as in its judgment were reasonable and proper, or would conduce to the safety and comfort of .its employes; and all servants, while engaged in such service with a knowledge of such rules and regulations, were bound to act in conformity therewith; and, if the injuries were sustained by them while acting in violation thereof, no recovery can be had of the defendant therefor, if such violation was the cause of, or materially and directly contributed to, such injury."

The defendant objected to the giving of said plaintiff's third instruction, either alone or with said defendant's said instruction, but the court overruled said objections, and each of them, and required said instructions to be read together to the jury; to which said rulings and action of the court the defendant then and there excepted.

Thereupon the defendant moved the court to give to the jury the following instructions:

"*Instruction No. 1.* The jury are instructed that the plaintiff can only recover by reason of negligence on the part of the defendant, and this negligence can only be established by a preponderance of the evidence."

"*Instruction No. 2.* If the jury believe from the evidence that the plaintiff's decedent was aware of the contents of the rules of the defendant company in relation to track foremen, or that special or extra trains might pass over the road at any time without any previous notice to the foreman or laborers upon the track; and if they further find that, with such knowledge, the said Thomas Waldron remained in the employ of the defendant, then, in that case, he assumed the risks of his employment without such notice."

"*Instruction No. 3.* The jury is instructed that the plaintiff can only recover after a finding that the defendant was guilty of such negligence that it caused the death of said Thomas Waldron, and that the decedent was not guilty of any such neglect or fault as directly contributed to produce the death."

"*Instruction No. 5.* If the jury believe from the evidence that there was unusual danger in running a hand-car upon the tracks of the defendant on the morning of the 4th day of October, 1884, and that Thomas Waldron knew or was bound to know of such unusual danger, then in that case it was his duty to use unusual precautions to protect himself."

To the giving of these instructions and each of them, the plaintiff objected; but the court overruled said objections, and permitted them to be read to the jury; to which rulings and action of the court the said plaintiff then and there excepted.

The defendant further moved the court to instruct the jury as follows:

"*Instruction No. 4.* The jury is instructed that the defendant company had a right to prescribe rules relating to section foremen, and the jury can not consider or determine whether such rules are reasonable or not." But the court refused to give said instruction without modifying the same by adding thereto the following: "Provided, the jury further believe from the evidence that Thomas Waldron had knowledge of such rules, and continued in the service of the defendant with such knowledge;" and the same was then given to the jury. To which rulings of the court, in refusing to give said last-named instruction without modifying the same, and in adding said modification, and each of said rulings, the defendant then and there excepted.

And, upon the further motion of the defendant, the court instructed the jury as follows :

"*Instruction No. 7.* If the defendant, in the exercise of its discretion, adopted a rule for the conduct of all its employes while engaged in its service, and intended for their personal protection against injury, and an employe, knowing the rule, neglected to avail himself of its provisions, and in consequence of such neglect sustained an injury, he can not hold the defendant liable therefor."

The defendant further moved the court to give to the jury the three following instructions :

"*Def't's Instruction No. 8.* The company is not liable for an injury which happens to an employe in consequence of disregard of its plain instructions."

"*Def't's Instruction No. 9.* The jury is instructed that the defendant company had a right to prescribe rules relating to section foremen and laborers upon the tracks, and the jury can not consider or determine whether such rules are reasonable or not."

"*Def't's Instruction No. 10.* Under the rules of the defendant, Nos. 401 and 402, it was not, at the date of the death of the plaintiff's decedent, the duty of the defendant to give notice to the laborers upon its tracks of the sending out of special or extra trains."

To the giving of these instructions, and each of them, the plaintiff objected, and the court sustained each of said objections, and refused to give either of said three last named instructions. To which rulings and action of the court, in refusing to give said instructions, and each of them, the defendant then and there excepted. And, as elsewhere appears in the record of this case, the same was argued and submitted to the jury, who rendered a verdict for the plaintiff.

The defendant made a motion that the court set aside the verdict of the jury rendered herein, and grant it a new trial, which motion was submitted to the court, and by it overruled ; to which ruling and judgment of the court the defendant excepted, and all of which appears of record as aforesaid. And the court entered judgment on the verdict, to which defendant excepted, and tendered this its bill of ex-

ceptions to the aforesaid rulings and judgment of the court, and prayed that the same might be signed, sealed by the court, and made part of the record in this Court, which was accordingly done.

From the judgment of the Circuit Court, rendered on May 29, 1886, the defendant has obtained a writ of error and *supersedeas.*

*J. Dunbar* for plaintiff in error.

*W. P. Hubbard* and *Dennis O'Keefe* for defendant in error.

GREEN, JUDGE:

This action on the case was brought by the administrator of Thomas Waldron, a track-repairer, against the Pittsburgh, Cincinnati & St. Louis Railway Company, to recover damages for the death of his intestate, caused by the neglect of the defendant by negligently running a train of cars against a hand-car, on which said Waldron was traveling to a point at which he was to do work in repairing the defendant's railroad. The suit was brought under our statute, to be found, chapter 104, §§ 5, 6, p. 708, Code W. Va. 1887. The court overruled a demurrer to each of the four last counts of the declaration. No defects in these last four counts of the declaration were pointed out by the defendant's counsel, and we see none. These counts did not state any one of the particular acts constituting the defendant's negligence, but only, in general terms, that it negligently ran its train of cars over the hand-car on which the plaintiff's intestate, its employe, was traveling lawfully, thereby causing his death; and none of them specifically stated that the plaintiff's intestate was not guilty of contributory negligence. In some States, these omissions would have been held to be defects in these counts; but in this State it has been expressly decided that such omissions are not defects. See *Hawker* v. *Railroad Co.,* 15 W. Va. 645; *Snyder* v. *Railway Co.,* 11 W. Va. 14.

The plaintiff was granted, by the court below, three instructions to the jury, as follows; "*Instruction No. 1.* The jury are instructed that it is immaterial what rules the defendant had adopted, unless they were brought to the

knowledge of the plaintiff's decedent, Thomas Waldron. *Instruction No. 2.* The jury are instructed that with respect to the question of contributory negligence on the part of Thomas Waldron the burden of proof is on the defendant. *Instruction No. 3.* The jury are instructed that the defendant was bound to take all reasonable precautions for the safety of the laborers employed by it on its track, including the plaintiff's decedent, Thos. Waldron."

To each of which the defendant excepted. The defendant's counsel admit that instructions Nos. 1 and 3 propounded the law correctly, but insist that there was no evidence justifying the giving of them. I will show hereafter that there was evidence submitted to the jury which rendered it proper to give these instructions. Instruction No. 2, it is claimed, does not propound the law correctly, and that the burden of proving there was no contributory negligence was on the plaintiff. But this Court has decided that this instruction propounded the law correctly. See *Snyder* v. *Railway Co.*, 11 W. Va. 14.

The defendant below asked six instructions to the jury, and one, No. 4, was granted, with a qualification, which was as follows: " *Defendant's Instruction No. 4.* The jury are instructed that the defendant's company had a right to prescribe rules relating to section foremen, and the jury can not consider or determine whether such rules were reasonable or not." The qualification added by the court in giving this instruction was: "Provided, the jury further believe from the evidence that Thomas Waldron had knowledge of such rules, and continued in the service of the defendant with such knowledge." The adding of this qualification, before the instruction was given, was excepted to by the defendant. If plaintiff's instruction No. 1 lays down the law correctly,—and the defendant's counsel admits that it does,— then this qualification of this instruction was necessary to make it consistent with plaintiff's instruction No. 1; for without the qualification that Thomas Waldron had knowledge of such rules it would be immaterial, in this case, what these rules were. And to instruct the jury that the company had a right to make any rules and regulations, unless qualified as it was by the court, would obviously have tended to mislead the jury.

The court refused to grant the following three instructions to the jury: "*Instruction No. 8.* The company is not liable for an injury which happens to an employe in consequence of a disregard of its plain instructions. *Instruction No. 9.* The jury is instructed that the defendant company had a right to prescribe rules relating to section foremen and laborers upon the tracks, and the jury can not consider or determine whether such rules are reasonable or not. *Instruction No. 10.* Under the rules of the defendant Nos. 401 and 402, it was not, at the date of the death of plaintiff's decedent, the duty of the defendant to give notice to the laborers upon its tracks of the sending out of special or extra trains;" to which the defendant excepted.

Instruction No. 8 ought not to have been granted, unless qualified as instruction No. 4 was, and, when so qualified, it would have been substantially the same as instruction No. 4, granted to the plaintiff and set out in the statement of this case. The instruction No. 9 was, when so qualified, precisely the same as instruction No. 4, which had been granted the plaintiff; and without this qualification, as I have shown, it ought not to have been granted. Instruction No. 10 was a simple construction of rules Nos. 401 and 402 of the defendant, as set out in the statement of the case, and they were perfectly plain in their meaning; but, as the plaintiff's instruction No. 1 has said, it was entirely immaterial what they were, or what they meant, if they were unknown to the plaintiff's intestate, Waldron; to have given this tenth instruction without this qualification would have misled the jury; and, if so qualified, it would have been of no possible aid to the jury, as the meaning of these rules was perfectly clear. Taking all of the instructions together, as stated in the statement of the case, those given and those refused and those qualified, they presented the law, so far as asked by either party, correctly to the jury.

It only remains to determine whether the court erred in refusing to grant the defendant a new trial. This will depend upon the law in reference to certain points in the case as to which neither party asked any instruction of the court, and which I will now consider. A master is not liable to his servant for negligence of his fellow-servant while en-

gaged in the same common employment, unless he has been negligent in the selection of the servant in fault, or in retaining him after notice of his incompetency. See Shear & R. Neg. § 86. And a " fellow-servant," within the meaning of this rule, is generally held to be any one serving the same master and under his control, whether equal, inferior, or superior. Id. § 100. One to whom an employer commits the entire charge of his business, with power to choose his own assistants, and to control and discharge them as freely and fully as the principal himself could, has nevertheless been generally considered not a fellow-servant with those who are employed by him. But even this has not been universally held; as, for instance, the contrary is held in Massachusetts. Id. § 103. But in section 104 they give sound reasons, we think, to bring the case within the same rule,—when the master delegates to a superintendent a power to appoint but not remove, or to remove but not appoint; and they refer to an Ohio decision and Kentucky decision to sustain this position. And it is the view of other text-writers. But the contrary views are held in many States; but I think the better considered of recent American cases is that, if a master delegates to a superintendent the performance of certain duties, to the extent of the discharge of those duties he stands in the place of the master; but, as to all other matters, he is a mere co-servant.

I have stated the law as held generally, and also the modifications of it by recent, and I think well considered, American cases; but I have deemed it unnecessary to refer to the authorities, or consider their reasoning, because the subject has recently been before this Court, and the whole subject maturely considered; and, for reasons assigned, we have reached definite conclusions as to who are to be considered as co-servants within the meaning of the rule, whom a railroad company employs to perform some duty, who has under his charge and controls other servants of the railroad company. This was done in the case of *Riley* v. *Railway Co.,* 27 W. Va. 145. The conclusions we then reached, and for the reasons assigned by Judge Snyder in delivering the opinion of the Court, we approve, and are not disposed to reconsider.

The syllabus of this case states these conclusions as follows: "When a railroad company puts a superintendent, foreman, or other employe in its place, to discharge some duty which it owes to its servants or employes, as to such duty such superintendent or other employe is not a co-servant, but the representative of the company; and as such duty the company is bound by the acts or omissions of such middle-man, the same as though the acts had been done or omitted by the company itself. Whenever such company delegates to another the performance of a duty to its servants which it has impliedly contracted to perform itself, or which vests upon it as an absolute duty, it is liable for the manner in which the duty is performed by the middle-man whom it has selected as its agent; and to the extent of the discharge of these duties by the middle-man, he stands in place of the company; but as to all other matters he is a mere co-servant. The question in such case is not whether the company reserved to itself any oversight or discretion, but whether it did in fact clothe the middle-man with power to perform its duties to the servant injured."

This being the settled law of this State, whatever may be the law in some other States, should Foutz, the foreman of the gang of track-repairers, be regarded, when this accident occurred, on October 4, 1884, as standing in the place of the defendant below as to its duties to these track-repairers, including the plaintiff's intestate, Waldron; or were Foutz, the foreman, and Waldron, co-laborers,—co-servants,—then, of the defendants below, the railroad company? That, in the words of the syllabus which I have quoted as laying down the law in this State, depends, not upon whether the company reserved to itself any oversight or discretion, but whether it did in fact clothe Foutz, the foreman, with the power to perform its duties to Waldron, its servant under the charge of this foreman. This must be ascertained by seeing what powers were conferred by the company on foreman Foutz. They are set out in the rules of the company, and from them we can ascertain both what his powers were, and what duty he owed the company. As Foutz and all other foremen were provided with a copy of these rules, he and they must of course be held as accepting the position,

with the powers as well as duties conferred and imposed by these rules. And, of course, his employer could by its rules confer on him whatever power it chose, and impose on him whatever duties it chose. And it is immaterial whether they were just and reasonable in the estimation of others or not. It was simply a bargain between the company and him, whereby they conferred on him certain powers, and, in consideration of certain pay, he agreed to perform certain duties. Such contract between the company and Foutz would be enforced as any other contract, if there were no special circumstances in the case which would prevent the court from enforcing it, or induce it to nullify such contract upon general principles applicable to other contracts.

The rules of the company regulating the powers and duties of Foutz, and all other foremen of track-repairs, were these: Rule 394: "Such foremen must engage in all work personally, and see that the laborers employed under them faithfully perform their duties." Rule 396: "They may discharge or suspend from duty any employe under their charge, but must report the case promptly to the supervisor for his approval. They must not increase their force without his consent." Rule 397: "They must compare time each day with the clock at the nearest telegraph office, or with the conductor of a train." Rule 401: "They must never obstruct the track in any way whatever, without first conspicuously displaying and using all danger signals at least 900 yards in both directions on single track, and 900 yards in the direction trains are expected on double track. Extra trains may pass over the road at any time without previous notice, and the foreman must always be prepared for them. Anything that interferes with the safe passage of trains at full speed is an obstruction." Rule 402: "They must run their hand-cars with great caution, always keeping a sharp lookout for extra trains, and protect themselves by signals at all dangerous points. They must not run within 20 minutes of the time of any passenger trains, nor in the wrong direction on double track. They must not permit their hand-cars to be used, unless they accompany them; nor run them on Sunday, or after working hours, without special permission from the superintendent. Hand-cars on tracks must not be

attached to trains in motion; and, when not in use, they must always be kept locked and secured in such a position that they can not be moved to endanger the safety of trains."

These rules are all perfectly reasonable, and there is nothing in them which a court could regard as vitiating the implied contract of Foutz, and every foreman of track-repairers, that he would comply with them. The only thing in these rules claimed to be vicious and unreasonable is the provision that 401 provides, in substance, that the company shall be under no obligation to give notice to the foremen of track-repairers when extra trains may pass over the road, and that these foremen must always be prepared for them. This is a perfectly reasonable stipulation; for it was proven that it would be impracticable to give such notices as such extra trains might be and were frequently started after a few minutes' notice to the company or its officers, and it was also shown that the railroad company generally did not undertake to give such notices of when extra trains were to be run, even if they had, in a particular case, ample time to give such notice. But there was nothing to forbid these foremen from getting such information whenever they could conveniently do so. It was perfectly convenient for them to get such information in very many cases, but not in all; for by another of these rules it was the duty of these foremen to go to a telegraph office of the company, or see a conductor of the road, every day, and set their watches, so as to have their time always accurate. This alone furnished them excellent opportunities every day to find out whether it was probable an extra train would be run over their part of the road the next day.

They might ascertain this in other ways. The foremen of the track-repairers over the section over which Foutz was foreman for a long time ascertained it by getting an engineer, who went over this section to get coal for his engine every day, to throw out a note to the foremen of track-repairers as he passed him, telling him when the next extra train would pass. This he doubtless had an opportunity daily to find out when he went up to Wellsburg to get coal for his train. There were doubtless other ways in which the foremen

of track-layers could frequently get such information if they were on the lookout for it. It was not the duty of the company to give them notice of such extra trains. But they were at liberty to ascertain this in any way they could. And one would suppose, as it was their duty to "run their hand-cars with great caution," they would, for their own safety, have ascertained, whenever they conveniently could, when an extra train would be run on their part of the track when they intended to have the hand-car put upon the track. The six-mile section over which Foutz was foreman of track-repairers was straight, and doubtless very often there was but little danger of a collision with an extra train, as it could, in clear weather, be seen coming from a distance sufficiently great to enable them to take the hand-car off the track before the extra train would reach the point where a collision would take place.

There can be no question but that foreman Foutz could have obtained the information that the extra train which killed his own son and Waldron, the plaintiff's intestate, would be on the track to take home to Wheeling the "Plumed Knights," who had gone on a pleasure excursion to Columbus, Ohio; and he could easily have found out at what hour this extra train would pass over his section of the railroad. The question of law as to whether Foutz, the foreman of this gang of track-repairers, including Waldron, the plaintiff's intestate, used proper caution, must be answered in the negative.

The rules we have quoted, of which he had a copy, gave him not only the power to discharge any hand under him, including Waldron, but, as I understand, he had also the power to employ hands in the place of those discharged, the limitations on his powers in employing hands being " he must not increase his force without the consent of his superior, or the supervisor," who in this case was one Kearns ; and he was bound to see that the laborers under him, including Waldron, faithfully performed their duties ; and, again, unless his superior, the supervisor, Kearns, interfered, he had the complete control of the hand-cars furnished him. They could only be used when he was on them, and at other times they were to be kept locked, so as effectually to prevent their

use except by the foreman. Surely, then, the company, by these rules, delegated to Foutz its whole power and control over this hand-car; and the hands upon it were put under his charge and control. Whatever duty, then, the company owed to these laborers on this hand-car, was delegated to Foutz, its foreman. And the company, under the law in this State, is bound by the acts or omissions of Foutz in the performance of this duty, to the same extent as if the company itself had done or omitted to do such acts.

I do not feel called upon to cite any authorities to sustain this position, as I have shown it is a necessary conclusion from a decision recently rendered by this Court, especially as the position taken by our Court in that case has been substantially reasserted in the still later case of *Maddem* v. *Railway Co.*, 28 W. Va. 610. While there are still many States where the position we have taken is not supported, to show the extent to which the law, as I have stated it, as to who are co-servants, and when one servant will be regarded as the representative of the master, and not as a co-servant, I will quote a few paragraphs from the opinion of the Court in that case, delivered by Judge Snyder. After some authorities, he says on pages 618, 619 :

"The rule deduced from these principles and authorities would seem to be that two servants of the same master are not fellow servants when one acts in a superior capacity to the other, in regard to some duty from the master, and the master is liable for any injuries to the subordinate, caused by the carelessness or negligence of the superior. At one time it was held that, to make the master responsible, he must have intrusted this superior servant with the actual control of all his business,—made him *alter ego*. *Brothers* v. *Cartter*, 52 Mo. 372; *Malone* v. *Hathaway*, 64 N. Y. 5; *Willis* v. *Navigation Co.*, 11 Or. 257, 4 Pac. Rep. 121. It was subsequently held that the superior servant must have had power to employ and discharge the inferior servant. But it seems to be considered sufficient that the inferior servant is under the control and subject to the orders of the superior servant. *Cowle* v. *Railroad Co.*, 84 M. C. 309; *Lalor* v. *Railroad Co.*, 52 Ill. 401 ; *Railway Co.* v. *Lundstrom*, 16 Neb. 254, 20 N. W. Rep. 198; *Hough* v. *Railway Co.*, 100 U. S. 216; *Railroad*

*Co.* v. *Herbert*, 116 U. S. 642, 6 Sup. Ct. Rep. 590. This modification of the rule was adopted from the first by Ohio and Kentucky courts. *Stone Co.* v. *Kraft*, 31 Ohio. St. 287 ; *Railroad Co.* v. *Collins*, 2 Duv. 114. It may be said generally, the only case where the old rule has not been impugned is when the servants are so far working together as to be practically co-operating, and to have opportunity to control and influence the conduct of each other, and have no superiority the one over the other. Since the rule grew up as judicial legislation, the courts may properly qualify or limit it to avoid injustice in particular cases. But the rule seems now very generally adopted and applied by the courts of this country." See, also, *Cooper* v. *Railroad Co.*, 24 W. Va. 37.

Let us now consider whether Foutz, the foreman, was guilty of negligence which caused the death of the plaintiff's intestate. The law is, as I understand it, that the master or person who represents him, as Foutz did the railroad company in this case, is bound to use reasonable care and diligence and make reasonable provision for the servant's safety ; and, if he has failed to do this, the master is responsible for an injury sustained as the result of his or his representative's negligence, unless the servant has contributed to his own injury by not using reasonable care for his own protection, (*Railway Co.* v. *Fox*, 31 Kan. 586, 3 Pac. Rep. 320) ; and if the work the servant is employed in is a particularly dangerous work, the master, or his representative under whose charge the servant is, must not induce him to do the work under the notion that it is less dangerous than the master, or his representative in charge of the servant, either knew it was, or ought to have known if he exercised reasonable diligence. See *Railroad Co.* v. *Holt*, 29 Kan. 152; *Railroad Co.* v. *Moore*, Id. 633; *Keegan* v. *Railroad Corp.*, 7 N. Y. 175 ; *Noyes* v. *Smith*, 28 Vt. 59.

The syllabus in the case of *Railway Co.* v. *Fox*, 31 Kan. 586, 3 Pac. Rep. 320, is: "At common law the master assumes the duty towards the servant of exercising reasonable care and diligence to provide the servant a reasonable time to work; and, when the service required of the employe is of a peculiarly dangerous character, it is the duty of the master to make reasonable provision to protect him from the dan-

gers to which he is exposed while engaged in the discharge of his duty."

The syllabus of *Hough* v. *Railway Co.*, 100 U. S. 216, is: "The master is under obligation not to expose his servant, when conducting his business, to perils or hazards against which they might be guarded by proper diligence on the master's part."

In *Railway Co.* v. *Lavalley*, 36 Ohio St. 221, the second point in the syllabus is: "It is the duty of a railroad company to make such regulations or provisions for the safety of its employes as will afford them reasonable protection against the dangers incident to the performance of their respective duties."

Applying these principles to this case: Was Foutz, the foreman, guilty of negligence which caused the death of the plaintiff's intestate? His duty was, among other things as stated in the railroad company's rule, a copy of which he had, as the railroad company did not undertake to give him notice of the times when extra trains would be run, "to run his hand-car with great caution; and always be prepared for them;" and he was always to be on the hand-car when used, and it was never to be used except by his direction.

It is true, as these rules never were furnished or read to Waldron, the plaintiff's intestate, they could not define or fix the limits of the duty of Foutz ,the foreman of the track-repairers, to Waldron, or any of the other laborers under the charge of Foutz. His duties to them were, so far as there were any, such and such only as the common-law imposed upon him as their master. See *Strong* v. *Railroad Co.*, 58 N. Y. 56. Those duties I have stated above, and it is obvious they would include those imposed on him by the railroad company, so far as they required him "to run his hand-car with great caution, and be always prepared for extra trains being run at any time, so far as by reasonable diligence and care he could be so prepared." It is not pretended that he took any sort of care, or used any sort of diligence, to prepare for the extra train which ran over his hand-car and killed Waldron.

It may be said that as the railroad company was not bound

to have him notified of the coming of this or of the other extra trains of cars, that he could not be prepared for its coming and he could do nothing whereby he could prepare himself for meeting such extra train, but had to take the chances, as did the laborers under him, of coming into collision with this or any other extra train as one of the risks ordinarily incident to his business, and if such collision ever took place with any extra train, it would be in law regarded as an accident for which there could be no responsibility. Is this true, in point of fact, according to the evidence in this case before the jury? It seems to me it obviously was not; for by the rules of the company, a copy of which he had, it was his duty every day to go to the nearest telegraph station of the company, or see a conductor of a train, to set his watch by the railroad time. If he did his duty,—manifestly a very important one to promote the safety of the laborers under his charge, Waldron included,—he had daily opportunities to inquire of persons likely to know, or at once, in case of the telegraphic operators, able to ascertain, when the next extra train would pass along; and, of course, every danger of a collision with such extra train as he was informed would next pass over the railroad could be, by the use of any caution as to the time he put his car on the track, be entirely avoided.

Again, he ought, as he himself had formerly done, if the opportunity offered, to have asked some one to get this information for him. He had formerly an understanding with the engineer of a steam-engine which went up to Wellsburg daily, to get coal for his engine, to find out there, it being a telegraphic station, when the next extra train would pass over the road, and to inform him by throwing off a note to him (the foreman) as the engine came back from Wellsburg, and passed the point where the foreman and the hands under him were at work. But this steam-engine had, before this accident, ceased to go up to Wellsburg daily after coal, and therefore, Foutz, if he desired it, could not have adopted this mode of getting information as to when the next extra train would pass over his section. But this shows, nevertheless, that he formerly thought it his duty, in order to be always prepared for extra trains as

the rules required him to be, to make such inquiries about them whenever he could. But foreman Foutz negligently, on the occasion of this accident, failed, so far as the evidence discloses, to make any such inquiries, though if he set his watch, as the rules required, he could, without any trouble, have made inquiries of the conductor of a train, or of a telegraphic operator of the company, when the next extra train over his section would be started. In all probability, the conductor of a train could have told him, as the arrangements had been made for running this extra two days before it was started; or if it was to the telegraph office he went to get his watch set by the railroad time, it is certain the telegraph operator could have told him this extra train would be run in the morning of October 4th. As he lived in Wheeling, and a large number of "Plumed Knights" had gone to Columbus on an excursion, I suppose he knew it, and also that they would be coming back on October 4, 1884; and, had he been a prudent and a cautious man, he might well have thought that it was not unlikely they would be coming back on an extra train, and he could have found out whether they would, and, if they did, whether it would come over his section of the road, by inquiring of Tomlinson, the passenger-agent of the railroad-company, with whom arrangements for such special trains would have to be made; and he lived in Wheeling, and could have given all the necessary information if he had been called upon by Foutz, the foreman.

But if it be admitted that Foutz, for any reason, did not have an opportunity of conveniently ascertaining at what hour an extra train would run over his section of the road on the morning of October 4, 1884, when this accident occurred, it would not in the least alter the case. There was no urgent necessity for any of the hands under him to go to work on the road on October 4, 1884. This is shown by the fact that he gave them all leave to attend that day the Democratic parade, which was to take place that day, and all his hands, except his son and Waldron, the plaintiff's intestate, accepted the leave, and remained in Wheeling. The morning of October 4, 1884, being very foggy, and Foutz having made no inquiries, and having no information that an extra

train would not run over his section, and having made no preparation for such a train, it was obviously negligent in him to have his hand-car put on the track, and to travel on it more than three miles, and to permit his son and Waldron to get on it with him, without informing them that in so doing they were running more than the ordinary risks incident to their business of track-repairing. Had he done so, Waldron might have declined to get on the car and, like the rest of the hands, might have stayed in Wheeling that day ; but after being told by the foreman that he had not made any inquiries as to whether an extra train would be on the track, and had made no preparations to prevent an accident, if Waldron had still chosen to get upon this hand-car, it is obvious that Foutz and the railroad company, his principal, would have been relieved of all responsibility, even though Foutz had been negligent in making no such inquiries, or any other preparation for meeting an extra train on the track.

Of course, if Waldron, the plaintiff's intestate, was careless and negligent, and thereby contributed to bring about this accident, the plaintiff could not recover in this suit. Was Waldron guilty of contributory negligence? The law, as I understand, is that a workman or servant, in entering upon any employment, is supposed to know and assume the risk naturally incident thereto ; for it is neither unjust nor unreasonable that the consequences which a servant or workman must have foreseen on entering into an employment, and which due care on the part of the master could in no way prevent, should not be visited on the latter.

But it is otherwise where injuries to servants or workmen happen through the negligence of the master, or his representative, such as Foutz was in this case. So far as the management and control of the hand-car, and the hands under him, he was the master, and the hands under him were servants, and the company whom Foutz represented was responsible for any injury suffered by his hands on his hand-car, under his immediate control, which resulted from his negligence, if his hands on the hand-car were guilty of no negligence. They had no control in the matter. They acted in subordination to him. They have a right to rely on his judgment as to when it was prudent to put the hand-car on

the track, and get upon it with the foreman. They had no opportunity or means of knowing whether any extra train was likely to be met by them while the hand-car was conveying them to their work. It is true, they assumed the risk, which was considerable. But they had a right to assume that all proper attention would be given to their safety, and that they would not be carelessly and needlessly exposed to risks, not necessarily resulting from their occupation, and which might have been prevented or much diminished, by ordinary care and precaution on the part of their master, or his representative, in this case foreman Foutz.

As track-repairing, and especially the use of the hand-car on the track, is very dangerous work, the foreman in charge of the hands, and who has the absolute control of the hand-car, as did Foutz, is bound to take care that he does not induce them to get upon and travel upon the hand-car, or even permit them to do it, under the notion that it is in a higher degree improbable they will come in collision with an extra train than it usually is. The cases from which I think these principles of law, as applied to this case, may be fairly deduced, are cases where servants were engaged in working with machinery or other appliances which were dangerous in themselves to work with, but the risk and danger had been, without the knowledge of the workman, increased by the machinery or other appliances being defective, the condition of which, by ordinary care and prudence, the master might have known, but the servant or workman did not know. In such cases, if injury has resulted to the servant or workman, without his fault, and simply because he trusted to his master to do his duty by not furnishing him with such defective machinery or appliances, the master will be responsible to the servant or workman for such injury, and the workman will not be regarded as having assumed such risk, or as having been guilty of contributory negligence in voluntarily using such defective machinery or appliances; he being uninformed as to such defects in them. Cases of this description are very numerous. See *Gibson* v. *Railroad Co.*, 46 Mo. 163; *Snow* v. *Railroad Co.*, 8 Allen 441, per Bigelow, C. J.; *Cooper* v. *Railroad Co.*, 24 W. Va. 37.

Wood, in his work on the Law of Master and Servant,

says, (section 366, p. 742:) "But a servant may maintain an action against his employer for injuries sustained by himself, resulting from the negligence of the employer in a matter in which, from the nature of the employment, the laborer has a right to rely upon the care and superior knowledge of the employer. It is true, the employe himself is bound to exercise all reasonable care and prudence; and if an injury results through his want of care, or through his own negligence, combined with that of his employer, he has no right of action against the latter. But, in determining what would be negligence on the part of the workman, reference must be had to his limited means of knowledge of the structures of machinery and processes upon which he is employed; also the fact that men whose business is the lowest form of human labor are not given to thought and reflection and foresight." The following cases are referred to as sustaining these views: *Noyes* v. *Smith*, 28 Vt. 59; *Byron* v. *Telegraph Co.*, 26 Barb. 39; *Clarke* v. *Holmes*, 7 Hurl. & N. 937; *Coal Co.* v. *Reid*, 3 Macq. H. L. Cas. 266; *Paterson* v. *Wallace*, 1 Macq. H. L. Cas. 748; *McMillan* v. *Railroad Co.*, 20 Barb. 449; *Connolly* v. *Pollon*, 41 Barb. 366.

I have examined such of these authorities as are accessible to me, and find that this conclusion drawn from them is correct. *Tarrant* v. *Webb*, 18 C. B. 797, is a case where a servant was injured by a fall from a scaffold erected by another servant, which fell for want of another upright. Some painters employed by the master told this servant that the scaffold was insufficient in this respect, and he called his master's attention to it, and told him what these painters had said. The master replied, if he hearkened to all the painters said, he would have nothing else to do. On this state of facts, it was held to be proper to instruct the jury that if the scaffold was erected under the personal supervision of the master, and was insufficient, he was liable. The reason of this holding was that the master had lulled his servant into a sense of security by what he had said to him.

Though these principles of law were laid down in cases where the facts were very different from the case before us, yet it seems to me that these principles are correct, as general principles, and are applicable to this case; and, under

them, Waldron was not guilty of contributory negligence. He was one of a gang of common laborers, repairers of a certain section of railroad, under the charge of foreman Foutz. The rules of the company, furnished to all the foremen, but not to these laborers, and which prescribed the powers and duties of a foreman, show on their face that the railroad company put entirely on these foremen the responsibility of determining, when a hand-car, furnished each foreman, should be put upon the railroad track to transport these laborers, in the charge of the foreman, to the section on the railroad in which the track was to be repaired. The sections each foreman superintended and kept in repair were short. Foutz's section extended six miles up the road from Wheeling. Each foreman had under him a small gang of laborers. Foutz had five. Their business was very hazardous, and especially so when they were on the railroad in a hand-car; for extra trains, or simply engines, called in railroad language "wild engines," might be started some time on a few minutes' notice, as when the exigencies of the railroad required them to carry materials or sand for the use of the road, or to send an engine from one point to another; and it was therefore impracticable for the officials of the railroad to give notice to these foremen of track-repairers of the time extra trains would run over their respective sections. They were by the rules, informed that the company would not undertake to give them such notices, but each foreman was required by the rules to be always prepared for these extra trains. They ran at very irregular times; but, on this section of foreman Foutz, they ran on an average two or three times a week.

The railroad company, by its rules, gave no directions to these foremen when they might put the hand-cars on the railroad, to carry laborers under their respective charges to and from their work, but left this entirely to the judgment and sound discretion of these foremen. But they were required to run these hand-cars with great caution, and never permit them to be put on the railroad track unless the foreman was personally upon it in charge of the laborers; and, to prevent this effectually, these hand-cars, when not on the railroad track, were required to be kept locked by the fore-

man, and they were positively forbidden to be attached to running trains by the foreman. They were to keep a sharp lookout for these extra trains, and protect themselves by signals at all dangerous points, and were never to run within 20 minutes' time of a regular passenger train. These directions show that the power imposed on these foremen to put these hand-cars on the railroad track at their discretion was one which necessarily required the exercise of the greatest precaution and prudence on the part of the foreman.

More or less risk was always run when these hand-cars, carrying the foreman and the laborers in his charge, were on the railroad track, as it was impossible to tell when it might be met or run over by a wild engine or extra train. But the foreman, if on the alert, could greatly reduce this risk, as he could by inquiry ascertain certainly when most of these wild engines or extra trains were expected to run over his section. And these foremen had excellent opportunities, if they duly appreciated the danger, to diminish it largely, by making such inquiries; for by the rules they were to see a conductor of a train, or to go to the nearest station, and see the telegraphic operator, every day, and set their watches correctly with the railroad time. This was absolutely necessary; for otherwise the danger of these hand-cars being run over, or coming in collision with regular trains, would be great. These conductors of trains would generally know what extra passenger trains would run over the road the next day, if any, and what time of the day they would run over the particular section of each foreman; and the telegraphic operator could tell with accuracy, by proper inquiries, when it was expected that wild engines or other extra trains would be running over the railroad track the next day.

These foremen frequently had other opportunities, besides these, of informing themselves about when it was expected to run extra trains or wild engines over his section of the road. Thus, in this case, it was shown that Foutz, for two years, had such opportunities, by getting an engineer who went up from Wheeling to Wellsburg, with the yard-engine for coal, to notify him when he would be along with his engine. This was done by this engineer or the yard-master sending a man on the regular train which went up before

him, and directing him to throw off a note addressed to Foutz, the foreman, informing him when this yard-engine would go up the track, This note would be always received by the foreman, Foutz, while at work with his laborers somewhere on the track. By proper prudence and caution these foremen could, by inquiries in advance as to when these extra trains or wild engines would be run, of the train conductors or telegraphic operators, one of whom he was bound to see every day, and by inquiries of others as opportunities offered, very much diminish the danger of his hand-car meeting or being run over by an extra train or wild engine. Probably, if the foreman was thus on the alert, as it was obviously his duty to be, in being prepared always for such extra trains, as the rules of the company required him to be, he would reduce the risk which he and his hands ran by more than one-half. Of course, they could not avoid all such danger by any amount of diligence, as a wild engine or extra train of some sort might occasionally be started over the track without any officer of the company having more than a few minutes' notice when it was to start.

Such were the dangers run by putting these hand-cars on the railroad, and such the duties imposed on the foremen of these repairing gang of laborers to diminish these risks. If such diligence was used and inquiries were made, and the day was a bright one, so that the train could be seen either way for a considerable distance, the risk run by using this hand-car would not be very great, as the probability of meeting an extra train or wild engine would be much reduced by the information the foreman would have gotten in advance by such inquiries; and if it should chance that, nevertheless, an extra train or wild engine was met, the hands on the car, if the day was bright, could get off it before the collision, and even have time, in many cases, to get the hand-car off the track in time to avoid a collision. The laborer under a foreman could, from what we have shown to be the law, be fully justified in presuming that his foreman would never have directed or permitted his hand-car to be put on the track on a very foggy morning, unless he had in some manner been satisfied, by inquiry the day before, that it was very improbable that any sort of extra train would be on

the portion of the section over which he proposed to run his hand-car. These laborers under a foreman, having no opportunity to learn when extra trains or wild engines would probably pass over their section of the railroad, would naturally and very probably leave to their foreman to determine when a hand-car could with a reasonable degree of safety be put upon the road. The railroad company had left it entirely to his discretion and sound judgment. He was required to be on the car with them, so that he ran the same risk that the laborers in his charge did. The railroad company having thus wisely left it solely to his judgment, can hardly complain that the laborers under his charge should also trust to his sound judgment and prudence, and make no inquiries of him as to whether or not he had been on the alert to ascertain whether any extra trains were expected, by a previous arrangement, to run over their section at the time they would be on the hand-car. They had clearly, under the law as I have stated it above, a right to presume that he had done all that a prudent man could do to diminish the risk that both he and the hands in charge ran by putting the hand-car on the track.

Now, what were the facts in this case? Foreman Foutz had, the evening before, told all the hands under his charge that, if any of them wished not to go to work on the railroad the next day, the 4th of October, 1884, they need not do so if they wanted to remain in Wheeling on that day, to be present at a Democratic parade to be held there. All of them except Waldron concluded to remain in Wheeling on that day. The next morning, directly the passenger train went up the river from Wheeling, Foutz with his son, about 13 years old, and Waldron, put his hand-car on the railroad track to go up to their work, some three or four miles north of Wheeling. Foutz, it turns out, had made no inquiries whatever the day before as to whether there had been any arrangements made by which an extra train would be run over his section of the road that morning. Had he made such inquiry of the train-conductor, or of the telegraph operator at the nearest station, he would certainly have ascertained that an extra train carrying the Plumed Knights of Wheeling from Steubenville to their home, would certainly be on

the track that morning, as the arrangement had been made for this as far back as the evening of October 2, 1884.

In fact, the wonder is that he did not learn the day before, even if he neglected his duty, and did not set his watch, as he ought have done, and thus did not see a train-conductor or a telegraphic operator, that the extra train bringing back these Plumed Knights would be back to Wheeling early on the 4th of October, 1884 ; for it must have been known to a great many people in Wheeling, where all these Plumed Knights lived. Foutz must have been very far from being on the alert, or he could hardly have failed to learn that this extra train would come down the track that morning. He lived in Wheeling, and this was known to very many persons there. It is strange he did not hear of it, whether he made any inquiry or not. The morning of the 4th of October, 1884, when Foutz had this car put on the track, and his son and Waldron got on it to go three or four miles up the railroad to their work, Foutz, though he had been thus grossly negligent of his duty in making no inquiries as to whether any extra train was expected to be running over his section that morning, said not a word to Waldron about his having neglected to make any inquiries as to such extra trains, but permitted him to get on the hand-car in utter ignorance of the neglect of this duty by his foreman. The inevitable result was that there was a collision between this hand-car and this extra train, whereby Waldron, the plaintiff's intestate, as well as Foutz's son, was killed.

Now, on the principles of law I have laid down, was Waldron guilty of negligence in getting on this hand-car that morning? Of course, he assumed, as he had a perfect right to do, that Foutz, his foreman, had in some way ascertained, the day before, that no arrangement had been made for running an extra train over that section of the road that morning. He knew that Foutz had the means of getting such information, and he had every reason to believe that he would avail himself of them. He knew that for nearly two years, whenever a yard-engine went up from Wheeling to Wellsburg to get coal, Foutz, always learned when such engine was to go up or come back, and he knew that he had to set his watch to the railroad time every day, and that he

had these and other opportunities of learning about extra trains and wild engines, while he had no opportunity whatever. Under these circumstances, it was not his duty to make any inquiry of Foutz whatever. He had, as we have seen, by the law, perfect right to presume that Foutz knew that no extra train was expected on the track that morning. Foutz's conduct was a strong assurance to him that this was the fact. His conduct in having the hand-car put on the track that foggy morning, and getting on it with his hands, would certainly induce them to feel sure that no extra train had been previously arranged to run over the track that morning. Foutz certainly lulled Waldron into a sense of perfect security, so far as any extra passenger train was concerned. In this respect, he much more fully lulled Waldron into a sense of security than did the master his servant in *Tarrant* v. *Webb*, 18 C. B. 797, before referred to.

It was the duty of Foutz to warn Waldon of the danger he was running of meeting some extra train, and to tell him he had failed, the day before, to make any inquiry whether any extra train was expected to be on the track that morning. Then Waldron would have been put on the same footing, or nearly the same footing, that Foutz was, in judging of the danger to which he would expose himself if he should get on the car that morning. Had he done so, who can say that Waldron would not have declined to get on the car, and remained that day, as his co-laborers did, in Wheeling? Waldron did not voluntarily assume the risk of a collision with a passenger extra train which had been days before arranged to run over the track that morning. He did not imagine he was incurring any risk of this character. He knew he might have a collision with a wild engine, or some engine and cars used for the company's work. This danger, as well as the danger of starting out on so foggy a day, he was willing to assume, and did so voluntarily. But he suffered no injury from assuming risks of this sort. He was killed by an extra passenger train which had been arranged to run over this section of the road two days before. Such risk he never assumed, and he had no idea he was running any such risk, as the conduct of his foreman, Foutz, had lulled him into perfect security, so far as a danger of this sort was con-

cerned. He trusted him, and presumed he had done his duty. And in this we have seen the law fully justified him. He was therefore not guilty of contributory negligence in bringing about the particular collision whereby he lost his life. It was caused by the negligence of Foutz, the foreman, alone. And the railroad company, the defendant below, is liable for the resulting damages caused by the negligence of one who was in this matter its representative.

It may be said that, in reaching this conclusion, I have ignored a number of cases which in their facts strongly resemble the case under consideration, and in which contrary conclusions were reached by highly respectable courts. I propose now to review these cases. The first of them is *Clifford* v. *Railroad Co.*, 141 Mass. 564, 6 N. E. Rep. 751. The syllabus is :

"A section-hand in the employ of a railroad-corporation can not maintain an action against a corporation for personal injury caused by a collision between a hand-car on which he was at work, and an engine of a train run by servants of the corporation, if the accident was occasioned by the negligence of the section-boss, and of the engineer of the train."

The facts were similar to those of the case now before us, except that in that case not only the foreman was negligent but also the engineer of the extra train, which was not true in the case before us. The reason assigned for the conclusion reached, as appears in the opinion of Chief Justice Morton, was, to use his language : " This was negligence of fellow servants, and it is the settled law of this Commonwealth that he can maintain no action against the corporation for injuries caused by such negligence. (*Hodgkins* v. *Railroad Co.*, 119 Mass. 419, and cases cited.)" In this State, as I have shown, it is settled law that Waldron was not a fellow-servant with the engineer of the express train nor was he a fellow-servant of the section-boss or foreman, Foutz. If the case before us had happened in Massachusetts, under their well settled law as to who are fellow-servants, it would, as under such law it should, have been held that the railroad company was not responsible to the plaintiff's intestate in this suit. But our law as to who are fellow-servants of a railroad company is settled entirely different from the law

in Massachusetts. In fact, it is settled in direct opposition to all the Massachusetts decisions. This case, therefore, is, of course, entitled to no consideration by our Court.

The case of *Railroad Co.* v. *Wachter*, 60 Md. 395, resembles also the case before us, except that so far as that case shows, there was no rule of the company putting the hand-car under the absolute control of the foreman of the gang of repair laborers. And there were two additional facts in that case : The laborer, one of the repair gang, had read the rules of the company, and lastly, the head-light was not exposed in front of the engine, as it was expressly required to be by the rules of the company, while in the case before us it was so exposed. It is obvious from the reading of the case that the foreman and the hands under him or with him, and also the engineer of the extra train, were all regarded as co-servants, under the Maryland decision, and therefore the conclusion that the railroad company could not be responsible was clearly right, according to the settled law of Maryland. But in this State, as neither the engineer of the extra train nor the foreman were co-servants with the hands under the charge of the foreman, this Maryland decision is entitled to no consideration. To show this diversity between our decisions and the Maryland law as settled by their decisions, I need only quote the following from this decision, found on page 401 : " Then, again, it was argued the morning was very foggy, and the head-light was not exposed in front of the engine. This, however, was the fault of the person in charge of the train; for the rules of the company expressly require the head-light to be exposed in foggy weather; and for negligence of such person the company is not responsible, unless it failed to exercise proper care in the selection or retention of such person; and on this question there was no evidence." Throughout the entire opinion, the foreman and the hands with him on the car are treated as if they were co-servants. There is no sort of suggestion that such foreman could be regarded as other than a co-servant with the other hands. This seems to be assumed as indisputable; and doubtless, in Maryland, according to their decisions, it can not be disputed; and, if such were our law under our decisions, of course the plaintiff's intestate could not recover in this suit of the defendant company.

There are two cases, however, one in Ohio, and one in Rhode Island,—bearing some resemblance to the case before us, which do not seem to be based on the difference between the law in this State and in those States as to who are co-servants among the employes of a railroad company. They are *Railway Co.* v. *Leech*, 41 Ohio St. 388, and *McGrath's Adm'r* v. *Railroad Co.*, 14 R. I. 357.

· The opinion of the court in the Ohio case will show the character of the case, and the grounds on which it was based. "The evidence shows that the deceased had lived near Read's Mill for several years, and had the same opportunity to know, in regard to the situation on the morning of the accident, as the foreman, Lotus, and the other members of his crew. It does not appear that he rode upon the car by any command or coercion from his superior. The car was provided for the convenience of the men in getting to their work. The men mounted the car without objection; the deceased was as willing as the others. So far as anything appears, all were ready to take the risk from delayed trains, without the delay of sending to the telegraph office, one mile away, which would have protected them. There was no negligence in the running of the train, nor in the running of the hand-car. As the deceased voluntarily and without objection assumed the risk, his representatives can not recover."

This decision is based on the ground that the foreman, Lotus, and his hand, Davis, each knew, and one as well as the other, what dangers they were running in getting on the hand-car. The accident occurred by coming in collision with a regular train which had been delayed. Both of them knew what was the regular time when this train should pass, but neither of them knew or had any opportunity of knowing whether it had passed, or whether it was delayed. They both took it for granted it had passed. The court based its decision on the ground that both the foreman and the laborer under him had the same opportunity to know what risk they were running from the chance of coming in collision with this train, and that both were willing to take this risk rather than be delayed while a messenger could go a mile to the telegraph office to learn the facts about whether this train was on time and had passed or was delayed. Now, I expressly

base the liability of the company, in the case before us, on the ground that the foreman, Foutz, had far better opportunity to ascertain whether any extra train was expected to pass the morning of the 4th of October, 1884, over his section, than his laborer under him, Waldron, who had no opportunity; and that Waldron did not know as much about the risk of starting on this car as he ought to have known if Foutz had told him the extent of his information, or rather want of information, and his failure to do so increased the risks which Waldron voluntarily assumed, as he supposed. I think the two cases are, in that important respect different.

The Rhode Island case is *McGrath's Adm'r* v. *Railroad Co.*, 14 R. I. 357. The rule of the railroad company was that "foremen may expect a train in either direction, without signal being shown for it, and will use every precaution to insure safety." The laborer who was killed knew this rule. The work of the day was finished, and the foreman said to his hands there were 20 minutes before the next incoming regular train, which was time enough to reach the next station before it came along. The court says "that thereupon they mounted the car without objection, the intestate as willingly as the others; all of them, for anything which appears, being willing to take the risk without the delay of sending out red flags, which would have protected them, apparently because they were in a hurry to get home, as it was Thanksgiving day. There was no carelessnes in the management of the special train after the hand-car was discovered. The accident may be attributed to two causes, to wit, neglect on the part of the hand-car to send out the red flags or take other sufficient precautions, and an omission, on the part of the company, to signal the coming of the special train. The defendant accepted both risks; the first by riding on a hand-car willingly, and without objection, knowing that the flags had not been sent out or other precautions taken; the second by riding, then knowing of rule 24, which permitted the dispatch of special trains without signaling in advance. By continuing in the service after being informed of the rule, he accepted the risk of such unsignaled special trains as one of the risks of the service."

Waldron, the repair-hand in the case before us, as in the

Rhode Island case, accepted both the risk arising from not sending out on October 4, 1884, red flags, or taking other precautions that morning, by riding on the hand-car willingly and without objection, knowing that flags had not been sent out or other precautions taken that morning; and he also accepted the risk of encountering any extra train or wild engine which might be on the track, and which the foreman, Foutz, could not, by the use of opportunities which he had, ascertain would probably be on the track, and come into collision with the hand-car. The evidence in the case before us shows that this extra train from Steubenville, with the Plumed Knights on it, was an extra train, which Foutz had opportunities, if used by him to ascertain would be on his section of the track, and probably come into collision with his hand-car. And in fact it did so, and caused the death of Waldron.

This Rhode Island case seems to me to be sound law, provided the foreman had not negligently failed to ascertain, when he had the opportunity, that this extra train would be on the track over which he was to pass with the hand-car about that time, so as to render a collision with it probable. The statement of the case simply shows that it was a special train from Providence. The burden of the proving that the arrangement to put this special train upon the track had been made a sufficient time before November 29, 1879, when the accident happened, for the foreman, if he had been cautious, to have ascertained, by opportunities which he must have had, when it would be on the track, was of course on the plaintiff below, the administrator of the laborer who was killed. So far as the case shows, there was no proof on this point; and the decision is in entire accord with the views I have expressed. And the same may be said of the case of *Railroad Co.* v. *Leech*, 41 Ohio St. 388.

It is not claimed that, if the plaintiff below had a right to recover, the damages awarded by the jury were excessive. The court, therefore, properly overruled the motion for a new trial, and rendered a judgment in accordance with the verdict of the jury.

The judgment of the Circuit Court, rendered May 29, 1886, must be affirmed, with costs and damages according to law.

AFFIRMED.