# CHARLESTON

## MADDEN'S ADM'R v. C. & O. RAILWAY CO.

Submitted September 14, 1886.—Decided October 30, 1886.

1. In an action for damages on account of negligence resulting in death it is not necessary, that the plaintiff should, under sec. 6, ch. 103, Amended Code, aver in his declaration, that the decedent left a wife, children or other next of kin. (p 611.)

2. When a plaintiff offers in evidence to the jury in an action against a railway company certain printed rules of the defendant, to the reading of which it objects, on the ground that said rules were not the rules in force at the time the cause of action arose; and the plaintiff submits evidence which shows *prima facie*, that said rules were then in force, it is not error for the court to permit said rules together with such evidence to go to the jury. (p. 612.)

3. It is a well established general proposition, that under the common law in America a master is liable to his servant for any neglect of the master's duty, whether committed by the master himself or by one to whom he has delegated his authority. (p. 616.)

4. It is the duty of a railroad company to establish proper rules and regulations for its service, and having adopted such rules to conform to them. (p. 617.)

5. Where an engineer upon one train of a railroad company is injured by the negligence of the conductor of another train of the company running in an opposite direction, or by the fault of one of the company's telegraphic operators in transmitting a telegraphic order to such conductor, such engineer being wholly without fault or the means of preventing such negligence or of avoiding its consequences; such engineer is not the fellow-servant of said conductor, nor is he the fellow-servant of said ope-

rator in regard to acts and telegraphic orders between the opera-
tor and said conductor within the rule, which exempts the com-
pany from liability for the negligent acts of fellow-servants or
persons engaged in the common service, and the company will
be held responsible for an injury to such engineer, caused by the
negligence of such conductor or operator in such manner. (p 619.)

*J. H. Ferguson* for plaintiff in error.

*E. Gibson, J. W. St. Clair* and *T. L. Michie* for defendant
in error.

SNYDER, JUDGE:

Action of trespass on the case, brought December 6, 1884,
in the circuit court of Fayette county by J. F. Doyle, admin-
istrator of John J. Madden, deceased, against the Chesapeake
& Ohio Railway Company, to recover damages for injuries
caused by the negligence of the defendant and which resulted
in the death of the plaintiff's intestate. The defendant de-
murred to the evidence, in which demurrer the plaintiff
joined, and under the direction of the court the jury found a
verdict fixing the damages of the plaintiff $6,000.00, subject
to the opinion of the court on the demurrer. The defend-
ant moved the court to set aside the verdict for the reason
that the damages found by it were excessive and not justified
by the evidence. The court took time to consider said mo-
tion and also what judgment it should render upon the de-
murrer to the evidence. At a subsequent term, on October
2, 1885, the court, without referring in terms to said motion,
decided that the law upon said demurrer was for the plaintiff
and gave judgment for him upon the verdict. The defend-
ant has brought the case to this Court by writ of error.

The errors assigned are as follows: *First*, the court erred
in overruling the demurrer to the declaration; *second*, in
·permitting certain evidence, set out in the defendant's first
and second bills of exceptions, to go to the jury; *third* in
finding for the plaintiff on the demurrer to the evidence; and
*fourth*, in giving judgment for the plaintiff without passing
upon the defendant's motion to set aside the verdict.

1. In support of the demurrer to the declaration it is
claimed that the declaration is not sufficiently certain and
definite, that it fails to set out or specify any act of negligence
by the defendant or its agents. The declaration does aver;

that the defendant wrongfully, wilfully and negligently caused two trains of cars to be run on its road upon a single tract in opposite directions at a speed of thirty miles an hour, thereby producing a collision of said trains, which caused the injuries that resulted in the death of the plaintiff's intestate. It is therefore plain that the defect thus insisted upon does not in fact exist.

It is further insisted that the declaration is bad, because it does not aver that the intestate left a wife or children. In *B. & O. R. R. Co.* v. *Gettle,* 3 W. Va. 376, it was held, that, in an action brought, under ch. 98 Acts of 1863, the declaration must aver that the decedent left a widow or next of kin and set forth the names. Since that decision our statute has been materially changed. Ch. 103 sec. 6 Amd. Code p. 634. It is not required or necessary, under our present statute, that the declaration should contain such averment. *B. & O. R. R. Co.* v. *Wightman.* 29 Gratt. 431.

Upon a careful consideration of the whole declaration, I think it is sufficient in law, and that the court did not err in overruling the demurrer thereto.

2. It appears from the defendant's first and second bills of exceptions that after two of the plaintiff's witnesses, Terrill and Dickinson, had testified as hereinafter set forth, the plaintiff offered to read to the jury certain printed rules of the defendant, at the head of which were the following words:

"Chesapeake and Ohio Railway; Huntington division; time-table No. 10 to take effect at 12 o'clock, noon, Sunday, May 20, 1883:

(Moving trains by telegraph).

The said Terrill testified, that he was in December, 1882, the time the plaintiff's intestate was killed, the telegraph operator and depot agent of the defendant at New Richmond; that at that time in the system then in use letters only were used—there were no figures; that we now use what is called the combination system in orders—his impression was that the latter system was adopted about twelve months after the accident, or maybe sooner; he did not have a copy of the time-table and general orders in use in December, 1882, and being shown a copy of the rules offered in evidence, he said

there might probably be some little change in these rules since 1882. The plaintiff then offered in evidence said printed rules from 149 to 172 inclusive, to the reading of any of which, except 152, the defendant objected, but the court overruled the objection and permitted the said rules to be read to the jury and the defendant excepted.

The witness Dickinson testified that he was baggage master on train No. 4 of the defendant in December, 1882, and had been in the employment of the defendant since 1877, that he had often seen the printed rules offered in evidence, he recollected the rules under which the trains were running in December, 1882, he had a memorandum of them which he produced and which were the same rules as those offered in evidence. The defendant here objected the reading of this memorandum in evidence, but the court overruled the objection and the defendant again excepted.

It is here contended by the plaintiff in error, that the court erred in permitting these rules to be read in evidence. It is claimed that the title or heading, attached to the memorandum on which these rules appear, shows that the rules were adopted in May, 1883, and were therefore not the rules in operation in December, 1882, when Madden was killed.

It does not seem to me, that such a conclusion necessarily follows. The proper reading and construction of this heading would not necessarily or conclusively indicate that the date had any reference to the rules. It might refer simply to the date or time at which "time-table No. 10," was to take effect. Without knowing certainly how the fact appeared to the court below, because the original memorandum, or an entire copy of it, is not before us, it is probable that the rules are for convenience printed along with the memorandum containing the time-table, and whenever the time-table is changed or a new one adopted the rules then and before in operation are simply transferred to the new time-table, and thus the date fixed for the time-table to take effect would have no reference to the date at which the rules were adopted or put in force. But however this may be, it seems to me that the evidence offered to show that these were the rules in operation in December, 1882, was sufficient to make a *prima facie* case that they were such and warranted the

court in permitting said evidence and the rules to go to the jury. The defendant could then have offered evidence to show that these were not the rules then in use in rebuttal of said *prima facie* case. As there was no such evidence offered by the defendant, I think it was proper for both the court and the jury to regard these rules as competent evidence. *Edgell* v. *Conaway*, 24 W. Va. 747. One of the witnesses stated positively that they were the rules in force in December 1882, and while the other said there might probably be some little change in them since 1882, he did not pretend to say that there was in fact any change, or that they were in any respect different. Besides the changes, if any, may have been made in some of the rules not offered in evidence, for it appears that the whole of the series was not read or offered in evidence. I do not think there was any error in either of the said rulings to the prejudice of the defendant.

3. The important inquiry in this case is, whether or not the court erred in its finding upon the demurrer to the evidence. The material facts proved by the evidence are as follows: On the 7th day of December, 1882, two locomotives with trains attached belonging to the defendant, running in opposite directions, the one going east and the other west, collided on the defendant's road at the west end of Stretcher's Neck tunnel in the county of Fayette, and John J. Madden, the plaintiff's intestate, who was engineer on said east bound train, known as No. 4, was so seriously injured by the collision that he died about ten hours thereafter; the said train No. 4 was a passenger train running four hours and thirty minutes behind its schedules-time, and said west bound train, known as No. 21, was a freight train running on its schedule-time. In this state of affairs, according to the rules and instructions of the defendant to its agents, it became the duty of the train-dispatcher at Hinton to direct and control the running of both said trains by telegraphic orders from his office directed to the conductor and engineer in charge of them respectively, and in discharge of that duty, Baird, the said train dispatcher at Hinton telegraphed order, No. 100, to "Stephenson and engineer," bring the conductor and engineer of said train No. 2, to run said train from Quinnimont to Hawk's Nest, and to use *four hours* and thirty minutes of

the time of No. 4; he also telegraphed to the conductor and engineer of train No. 4, to run said train four hours and thirty minutes late to Hinton; that said order No. 100 was sent to the telegraph operator at New Richmond for delivery to the conductor and engineer of train No. 21, and it was the duty of said operator to make three copies of said order, one to be filed in his office, one for the conductor and the third for the engineer of said train; he made what he claimed to be three such copies, and delivered two of them to the engineer of train No. 21, one for the engineer himself and the other for Stephenson the conductor of said train; the engineer delivered one copy to said Stephenson, and at the time of such delivery said Stephenson and said engineer, as it was their duty to do, read and compared said copies, and both of them read and understood them as reading, "use five hours and thirty minutes of the time of No. 4," and with this understanding they ran to Quinnimont and from there they started their train, No. 21, for Hawk's Nest in obedience to said order as read by them, intending to get on the side-track at McKendree station below to let No. 4 pass them at that place; if the time stated in said order had been correct, that is, *five* hours and thirty minutes, they had ample time on leaving Quinnimont to run to McKendree station and there get on the side track before train No. 4 reached there; but by reason of the mistake in said telegram or in the reading of it by the conductor and engineer, thus causing them act as though they had *five* hours and thirty minutes, instead of *four* hours and thirty minutes, to use in reaching McKendree station, being one hour more than they had in fact, their train No. 21 going west collided with said train No. 4 coming east at the west end of Stretcher's Neck tunnel, a distance of about two and a-half miles west of Quinnimont, and by said collision the plaintiff's intestate, who was the engineer of said train No. 4, received the injuries which caused his death. Madden, the decedent, was at the time of his death about 37 years of age, was intelligent and of good habits; he left a widow and two children aged about six and three years, respectively; the wages paid him by the defendant was from $100.00 to $125.00 per month.

By the rules of the defendant's company, train No. 4, being

less than twelve hours behind its schedule time, was entitled to the right of way and was required to keep on its course unless arrested by telegraphic order; all telegraphic orders were required to be written by the receiving operator, and two copies thereof delivered to the conductor to whom addressed whose duty it was to carefully read them and if understood to sign them, then retain one of the copies for himself and deliver the other to his engineer and see that he understood it before starting his train; the conductors are also required to show their orders to their rear brakeman and the engineers to show theirs to their firemen. In this instance the conductor of train No. 21 did not go to the telegraph operator to get the order No. 100; his engineer received two copies from the operator and then delivered one of them to the conductor. The operator testified, that the conductor did not come into the office that day, that the copies he handed to the engineer read, "use *four* hours and 30 minutes of the time of No. 4," and that the engineer so read it to him in his office; the conductor testified, that the engineer brought the copies of order No. 100 to him signed, and that he and the engineer read and understood them to read, "use *five* hours and thirty minutes of the time of No. 4," and that he acted on that reading and hence the collision resulted. The counsel for the defendant admitted on the trial in the circuit court, that order No. 100 reads, "use *five* hours and thirty minutes of the time of No. 4." The engineer of train No. 21, was killed by the said collision and therefore his testimony could not be had.

These facts clearly show, that the collison, which caused the death of Madden, was produced by the mistake in writing or in reading the copies of telegraphic order No. 100 by the agents of the defendant, and the question presented for our decision is, was this such negligence on the part of said agents as will make the defendant liable in this action?

It may be announced as a general proposition fully sustained by the decided cases, that in America, under the common law, and in England, under the "Employer's Liability Act," a master is liable to his servant for any neglect of the master's duty, whether committed by the master himself or

by one to whom he had delegated his authority. *Corcoran v. Holbrook*, 59 N. Y. 517; *Chicago, &c., R. R. Co.* v. *Jackson*, 55 Ill. 492.

The duties of the master or employer may be summed up as follows:

*First*: To provide safe and suitable machinery and appliances for the business. This includes the exercise of reasonable care in furnishing such appliances; and the exercise of like care in keeping the same in repair and making proper inspections and tests. *Cooper* v. *Railroad Co.*, 24 W. Va. 37; *Riley* v. *Railroad Co.*, 27 W. Va. 145; *Hough* v. *Texas & P. R. R. Co.*, 100 U. S. 213; *Frazier* v. *Pa. Co.*, 38 Pa. St. 104.

*Second*: To exercise like care in providing and retaining sufficient and suitable servants for the business. *Harper* v. *Indianapolis & St. L. R. R. Co.* 44 Mo. 488.

*Third*: To establish proper rules and regulations for the service, and having adopted such to conform to them. *Chicago, &c., R. R. Co.* v. *Taylor*, 69 Ill. 461.

All the foregoing duties, it will be observed, are included in the one general duty of the master to provide a safe plant. The law is well settled that the master is not required to be a guarantor or insurer in this behalf; but is only required to employ reasonable and ordinary care in selecting what he requires and is necessary for his business. Cooley on Torts, 557; *Redhead* v. *Midland R. R. Co.*, 2 Q. B. 412; *Toledo, &c., R. R. Co.* v. *Fredericks*, 71 Ill. 294.

In applying these principles it has been held, that a section foreman and brakeman are not fellow-servants, because the former performs an implied duty of the master. *Riley* v. *Railroad Co.*, 27 W. Va. 145; *Lewis* v. *R. R. Co.*, 59 Mo. 495.

Where a switchman was killed through the default of the railroad company in not making and enforcing such proper rules and regulations as would secure the safety of its employes, the company was held liable. *Chicago &c., R. R. Co,* v. *Taylor*, 69 Ill. 461.

In *Chicago &c. R. R. Co.* v. *Ross*, 112 U. S. 377, it was decided by a divided court, five judges to four, that, "A conductor of a railroad train, who has the right to command the movements of the train and to control the persons employed upon it, represent the company while performing

78

those duties, and does not bear the relation of fellow-servant to the engineer or other employes of the corporation on the train." In the opinion of the court, delivered by Justice Field, it is said: "We know from the manner in which railways are operated that, subject to the general rules and orders of the directors of the company, the conductor has entire control and management of the train to which he is assigned. He directs when it shall start, at what speed it shall run, at what stations it shall stop, and for what length of time, and everything essential to its successful movements, all persons employed on it are subject to his orders. In no proper sense of the terms is he a fellow-servant with the firemen, the brakemen, the porters and the engineer. The latter are fellow-servants in the running of the train under his direction; as to them and the train, he stands in the place of and represents the corporation"—112 U. S. 390; Whart. Neg. §232 *a; Brickner* v. *N. Y. Cent. R. R. Co.* 2 Lans. 506; S. C. 49 N. Y. 672; *Malone* v. *Hathaway* 66 N. Y. 5.

It was also held, in *Little Miami R. R. Co.*, v. *Stevens*, 20 Ohio 415, that when a railroad company placed the engineer in its employ under the control of a conductor of its train, who directed when the cars were to start and when to stop, it was liable for an injury received by him caused by the negligence of the conductor. It was also held by the same court, that a conductor and brakeman on the same train were not fellow-servants, and that the company was liable for an injury to the latter caused by the negligence of the former. *Railroad Co.*, v. *Keary*, 3 Ohio St. 201.

The rule deducted from these principles and authorities would seem to be, that two servants of the same master are not fellow-servants when one acts in a superior capacity to the other in regard to some duty due from the master, and the master is liable for any injuries to the subordinate caused by the carelessness or negligence of the superior. At one time it was held, that to make the master responsible, he must have entrusted this superior servant with the actual control of all his business—made him *alter ego. Brothers* v. *Cartler*, 52 Mo. 372; *Malone* v. *Hathaway*, 64 N. Y. 5; *Willis* v. *Oregon &c., Co.*, 11 Oreg. 257. It was subsequently held

that this superior servant must have power to employ and discharge the inferior servant. But now it seems to be considered sufficient that the inferior servant is under the control and subject to the orders of the superior servant. *Cowles* v. *Richmond &c., R. R. Co.*, 84 N. C. 309; *Lalor* v. *Chicago &c., R. R. Co.*, 52 Ill. 401; *Chicago &c., R. R. Co.* v. *Lundstrom*, 16 Neb. 254; *Hough* v. *Railway Co.*, 100 U. S. 216; *Northern Pacific R. R. Co.* v. *Herbert*, 116 U. S. 642.

This modification of the rule was adopted from the first by Ohio and Kentucky courts. *Berea Stone Co.* v. *Kraft*, 31 Ohio St. 287; *Louisville and N. R. R. Co.* v. *Collins*, 2 Duv. 114.

It may be said generally, that the only case where the old rule has not been impugned, is where the servants are so far working together as to be practically co-operating, and to have opportunity to control or influence the conduct of each other, and have no superiority, one over the other. Since the rule grew up as judicial legislation, the courts may properly qualify or limit it to avoid injustice in particular cases. But the rule seems to be now very generally adopted and applied by the courts of this country. Wood on M. & S. 837; *Railroad Co.* v. *Fort*, 17 Wall. 559; 3 Wood's Railway Law, sec. 377, p. 1469.

According to these rules and principles, it seems to me, the circuit court did not err in finding for the plaintiff on the demurrer to the evidence. It is scarcely necessary to repeat the well settled rule governing the construction of the evidence in cases of this nature. All inferences of fact that may be fairly deduced from the evidence must be made in favor the demurree; and in determining the facts thus inferable those inferences most favorable to the demurree will be made in cases where there is grave doubt which of two or more inferences shall be drawn. *Heard* v. *Railway Co.*, 26 W. Va. 455.

The fault which caused the injury in this case, according to the facts proved, may be attributed to the conductor, the engineer, or to the telegraph operator at New Richmond, to all or any one of them. Under the rule for considering the evidence above indicated, the court in acting upon the demurrer to the evidence had the right to attribute this fault to

any one or all of them. The train was under the immediate control and management of the conductor, subject only to such orders as might be given him by telegraph. The rules of the company prescribed the manner in which he should receive these orders. It was made his positive duty to go in person to the telegraph office and read them with, and sign them in the presence of, the operator. This he wholly failed and neglected to do in this instance; but instead, he entrusted this duty to his engineer. This was gross negligence on his part. If the testimony of the operator is credited, as it may rightfully be on the question before us, then the collision was produced by the negligence of the conductor; for, the operator says that he and the engineer read the order "use *four* hours," &c., instead of "*five* hours," &c. If the order had been thus read and understood by the conductor, that is, if he had performed his plain duty, it is reasonable to suppose he would not have started his train, No. 21, from Quinnimont until after No. 4, the train on which Madden was engineer, had passed, and the collision and death of Madden would not have occurred. The fault may therefore be attributed wholly to the gross negligence of the conductor of train No. 21.

Madden, the engineer, who was killed, was not on the train of this conductor, but on No. 4, a train running in the opposite direction. There is no pretence that there was any fault or negligence on his part or on the part of any one in the management or control of his train. He was strictly in the line of his duty. He was in no manner connected or co-operating with the conductor or engineer of train No. 21, and could not therefore exercise any control or influence over them or either of them. Without, therefore, going to the extent of the decision in *Chicago, &c., R. R. Co.* v. *Ross*, 112 U. S. 337, before referred to, in which it was held that the conductor and engineer of the same train were not fellow-servants, and that the company was liable for an injury to the latter caused by the negligence of the former, we think that, under the principles and authorities hereinbefore mentioned, we may safely hold that the conductor of train No. 21, in this case, was not such a fellow-servant with Madden, the engineer of train No. 4, as would exempt the company

from liability for the injury to the latter caused by the gross negligence of the former.

If, however, we attribute the fault, which caused the injury, to the telegraph operator, it seems to me, the result ought not to be different. The operator was employed in a separate branch of the service and under the control of other officers of the company. He was not so situated and co-operating with Madden as to enable the latter to control or influence his conduct in any manner. Certainly not his acts and communications with those in the control and management of trains other than the one on which he was employed. If they could in any sense be considered as co-operating together, the operator was the superior servant in the line of his duty, and the engineer was subject to his orders or the control of those who were so subject. The law is well settled, as we have seen, that the company is bound not only to provide safe and suitable machinery and appliances for its business, but it must exercise reasonable care in keeping the same in repair. If the agents of the company fail to keep the road, cars or other appliances in good and safe condition and repair, and an injury thereby is caused to other employes, the company is liable. It is also the duty of the company not only to establish proper rules and regulations for its service, but it must enforce those rules and regulations in order to exempt it from liability for the negligence of those agents whose duty it is to enforce and comply with them. In this case neither the conductor of train No. 21, nor the telegraph operator at New Richmond, either complied with or enforced the rules prescribed by the company. The rules made it not only the duty of the conductor to receive the telegraphic orders from the operator, but they likewise made it the duty of the operator to deliver them to the conductor in person, and see that he understood them. This grave and important duty was wholly neglected and disregarded by both these agents. If a mere switch-tender, repair-boss or inspector represents the company, and the company is made responsible for his negligence to its servants employed on the trains for injuries caused by such negligence, as the courts have often held it shall, then, it seems to me the same considerations and reasons which impose the liability in such case, would make the

conductor or the telegraph operator the representative of the company and hold it responsible for injuries resulting from his gross negligence to employes no way in fault and in no manner connected with the negligent act; that is, where the injured servant, as in this case, was on a train to which the false telegram was not sent, and where no degree of caution or vigilance could have enabled him to prevent the fault or avoid its consequences. How was it possible for the engineer on train No. 4 going east to know or even conjecture what telegrams or orders had been given to the conductor on train No. 21 going in the opposite direction. Madden was not and could not under the settled rules of law in such cases be treated, under such circumstances, as the fellow-servant of the conductor of train No. 21 or of the telegraph operator at New Richmond in regard to telegraphic orders delivered by him to said conductor. The service in which this conductor was employed, and the act of the operator in delivering telegraphic orders to him, were as distinct from the service in which Madden was engaged as if it had been in a different branch of the business of the company. Upon the most earnest consideration, therefore, I am of opinion that the court did not err in finding as it did upon the demurrer to the evidence.

4. The last error assigned, that the court erred in giving judgment for the plaintiff without passing upon the defendant's motion to set aside the verdict, was not argued before this Court, and may therefore be regarded as having been abandoned, but whether so or not, it is wholly without merit. By rendering judgment for the plaintiff on the verdict, the court necessarily passed upon said motion and overruled it. It is not claimed that the court should have sustained said motion, and if it had been so claimed, we could not hold that any error was committed in that regard. The facts proved may be considered sufficient for the jury to find the verdict they did; at least, they are not such as would warrant this Court in setting aside the verdict.

For the reasons aforesaid the judgment of the circuit court must be affirmed.

AFFIRMED.