## CHARLESTON.

DANIEL'S ADM'R *v.* CHES. & OHIO R'Y CO.

Submitted January 25, 1892.—Decided April 2, 1892.

1. DAMAGES—NEGLIGENCE—RAILWAY COMPANIES—EMPLOYE.
    When a conductor, in charge of a railroad train, with a right to command and to control its movements, leaves his engine and train standing on the track of the main line, along which a train due and expected by him has a right at that time to pass, and such conductor fails to use ordinary care to warn or notify in any way the expected train of such obstruction in its way, whereby a collision takes place, and a brakeman on the coming train is injured, and such negligence of the conductor is the direct and proximate cause of such injury, such brakeman being without fault or the means of preventing such negligence or of avoiding its consequences is not the fellow servant of the conductor, and the company will be held responsible for the injury to the brakeman, caused by the negligence of the conductor in such manner. (p. 410.)

2. RAILROAD COMPANIES—CONDUCTOR.
    A yard master, in lawful command and control of a train as a conductor for the occasion, is a conductor within the meaning of the rule. (p. 419.)

*Simms & Enslow* and *J. E. Chilton* for plaintiff in error cited Pat. R'y Acc.; McKin. Fel. Serv. 101 ; 58 N. Y. 217 ;

25 N. Y. 562; 74 Ill. 341; 27 W. Va. 145; 28 W. Va. 610; Id. 617; 69 Ill. 561; 19 Ill. 510; 74 Ill. 341; 30 W. Va. 798; 30 Gratt. 805; 24 W. Va. 47; 33 W. Va. 135; 31 W. Va. 142.

*Wm. R. Thompson* for defendant in error cited 28 W. Va. 610; Id. 618; McKin. Fel. Serv. 112; Id. 168; 112 U. S. 390; 30 W. Va. 833–835; McKin. Fel. Serv. 160, 164; Id. 118–122; Id. 125, 126; Id. 131; Id. 133; Id. 136–137; Id. 140, 143; Id. 150; Id. 155; 27 W. Va. 145; McKin. Fel. Serv. 78; 4 S. E. Rep. 339; 78 Va. 745; 29 Kan. 633.

Holt, Judge:

This is a suit in the Circuit Court of Summers county, brought 31st March, 1890, by plaintiff below against the railway company, defendant below, for causing the death of Robert Daniel, plaintiff's intestate, by its negligence, while the decedent was a servant in the railway company's employ. The suit resulted in a verdict for three thousand seven hundred and fifty dollars damages, which the Court refused to set aside, but gave judgment thereon. To this ruling and various other rulings made during the trial the defendant company excepted and has obtained this writ of error.

The suit is based on section 5, c. 103, Code, p. 725 (Ed. 1891): "Whenever the death of a person shall be caused by wrongful act, neglect or default," *etc.*—the West Virginia form of the Lord Campbell Act.

The declaration contains three counts. The first charges that plaintiff's intestate was in the railway company's employ as a brakeman, and while in discharge of his duties, defendant by its recklessness, carelessness and negligence then and there caused the death of plaintiff's intestate. The second count alleges as the defendant's act or neglect and default that it carelessly left standing on its line, one mile from any station or side track, a train of cars, into which the deceased brakeman's train, without warning, was run, without any fault on the part of the running train, which caused the brakeman's death, *etc.* Third count sets out the facts of the accident in great detail, averring that

they resulted in the brakeman's death, directly caused by the wrongful act, neglect, and default of defendant; thus giving plaintiff, by reason of the premises, a right of action for ten thousand dollars the damages sustained (the maximum fixed by law).

The demurrer was properly overruled, because the court could have given judgment on either count according to the very right of the cause, and according to law; the case as alleged being proved.

On the plea of "not guilty" the issue was made up and tried by the jury.

The facts are as follows: Robert Daniel, plaintiff's intestate, was at the time of the accident a brakeman in the employment of defendant on section two of No. 78, a freight train on defendant's road. His run was from Sewell to Hinton and back. Freight train No. 78, between these points, was run in two sections. J. W. Spease was assistant yardmaster of the railway company at Hinton.

On the 26th day of March, 1890, section one of defendant's freight train had reached Hinton, Spease took charge of it, to break up the train, distribute the cars, *etc.*, according to his duty, and for this purpose the cars were at some point uncoupled. On these cars, thus left to stand until Spease had disposed of the others, Sweno, the brakeman, had neglected to set the brakes; so that, when Spease uncoupled and moved off with engine and front cars, the four rear cars ran back by gravity down the track to the mouth of Tug creek, a mile and a half west of Hinton towards Sewell. Here they stopped.

Spease was engaged in shifting the front part of section one about fifteen or twenty minutes, and when he returned with his engine he found that the rear portion of the train, which had been left, had escaped, and run back down to Tug creek, as already described—a point between one and a half and two miles from Hinton, on the main line. As soon as Spease found the cars had escaped, he started with the engine in pursuit, having with him, the engineman of the yard shifter locomotive, and a brakeman and workman, all under Spease's control. They found the runaway cars at Tug creek.

It was proven that J. M. Spease had as full command and charge of section one of No. 78, and of the part which escaped and ran back to Tug creek, as a conductor has while in charge of his train and running it on the road, and the like power of control and command over the escaped part while it stood at Tug creek. Spease also knew that section two, on which Daniel was engaged as brakeman, was following section one of No. 78, and was then due at Hinton.

When Spease reached the escaped cars at Tug creek, Spease's brakeman immediately began to try to couple up the escaped cars to the cars brought down with the engine from the yard at Hinton; he had two couplings to make, and attempted to make one of them some fifteen times, but the link was bent, and he failed, and was still attemping to couple them when the engineer on the coming section No. two of No. 78 blew down brakes just before the collision occurred. The time was 3:30 in the morning. It was dark and foggy.

There were two brakemen—Robert Daniel, the one killed by the collision, and another on said second section of train No. 78—and, if both had been standing at the brakes and applied them immediately when the signal sounded down brakes, the accident could not have been averted. The train was a freight train, running at the rate of eighteen or twenty miles an hour. Spease had charge of the train, including the escaped cars, and had with him under his control the engineer, brakeman and a workman from the roundhouse, and no one else was present.

Spease, as the rules of the company required, went back in the direction from which section two—the coming train —was expected, for the purpose of flagging or to signal it to stop, but he went back from the rear of his own train standing on the track at Tug only some fifty or one hundred yards, instead of one thousand two hundred yards as required by the rules of the company. He had ample time to have gone back the distance required to flag, if he had desired to do so, before the expected train came. A red light is used and required by the rules for the purpose of flagging; but Spease on this occasion had a white light. He overtook the escaped cars more than thirty minutes be-

fore the accident occurred, and had at least thirty minutes in which to have gone back to flag the expected train, and if it had been flagged six hundred yards from the rear of Spease's train the expected train could have been stopped, and the accident averted.

It was also proved that at the time of the collision and wreck it was the duty of the conductor to flag between stations, and the duty of the breakman to flag at stations, and that, when a train was stopped by accident or obstruction, the flagman must immediately go back with danger signals, to stop any train moving in the same direction. At a point six hundred yards distant he must place one torpedo on the rail. He must then continue to go back at least one thousand, two hundred yards from the rear of his train, and place two torpedoes on the rails, ten yards apart; then return to a point nine hundred yards from the rear of his own train, and there remain until recalled by the whistle of his own engine; but if a passenger train is due within ten minutes he must remain until it arrives, *etc.* See rule 99 in schedule 357.

Instead of this, the conductor for the occasion—the yard-master—went back but fifty or one hundred yards, with a white light instead of a red one. The morning (3:30) was dark and foggy. The coming train rushed on at a speed of eighteen or twenty miles an hour. The engineer sounded down brakes, reversed his engine, and sprang off just in time to save himself. All escaped by jumping off except front brakeman Daniel, who was at the time of the collision standing at the rear of the tank attached to the rear of the locomotive, and had no duty to perform in the engine cab except to keep out of the weather, and by the rule he was not permitted to ride on the engine cab, except when called there by some duty, without a written order from the proper authorities, and it does not appear whether he had such permit or not. Daniel was caught in the wreck and killed; the others escaped by jumping off the train. Seven or eight of the front cars of the second section were by reason of the collision shattered, broken up, and derailed.

If the expected train had been flagged at a point seven or eight hundred yards from the obstructing train standing on

the main line, the train could have been stopped in time to avoid the collision.    The deceased was a young man of good habits, sober, frugal, and industrious, twenty one years old, and earning from fifty to sixty five dollars per month. Thereupon the following instructions were given for the plaintiff:

Instruction No. 1, given for plaintiff:

"The court instructs the jury that if they believe from the evidence that on the 26th day of March, 1890, one Spease was in the employ of the defendant as assistant yard master at Hinton, and that as such assistant yard master said Spease was in charge of a train of cars, or part of a train of cars, belonging to the defendant, known as the 'First section of No. 78,' at a point on the line of the said railroad of defendant between one and two miles west of Hinton ; and that said Spease, as to such train of cars then in his charge, had all the rights and authority, and was charged with all the duties, of a conductor in charge of one of the trains of cars of the defendant ; and that the plaintiff's decedent, R. Daniels, was in the employ of the defendant on one of the defendant's trains of cars known as 'Second section of No. 78,' and that said Spease knew that at the time he was in charge of said train of cars known as 'First section of No. 78,' standing on the main line of defendant's railroad at Tug creek, that said train of cars known as 'Second section of No. 78,' was liable at any moment to come along said railroad on its way to the yards at Hinton on the same track upon which the train of cars of which said Spease was then in charge was standing ; and the said Spease also knew that said train of cars, or part of the train of cars, of which he, the said Spease, was then in charge as aforesaid, could not be moved immediately in the the direction of the yards at Hinton because of the said train of cars not being coupled together, and that said Spease undertook to flag said second section of train No. 78, upon which plaintiff's decedent, R. Daniels, then was as a brakeman, and failed to go back in the direction from which said second section of No. 78 was approaching, more than fifty or one hundred yards, and that said Spease had ample time, and could have gone back a sufficient distance

to have warned said section of No. 78 of the obstruction of the railroad track in time for said second section of No. 78 to have been stopped, and to have prevented the accident which did occur; and, if the jury further believes that this conduct on the part of Spease was negligence, and was the immediate and proximate and direct cause of the accident and the death of plaintiff's decedent, R. Daniels—then the negligence of said Spease is the negligence of defendant, and the jury must find for the plaintiff."

Instruction No. 2, given for the plaintiff:

"The court instructs the jury that if they believe from the evidence that plaintiff's decedent, R. Daniels, was in the cab of the engine attached to the second section of train No. 78 on the morning of March 26, 1890, at the time the accident occurred, and that said R. Daniels had no right to be there, but should have been at the brakes on the cars in said train, and that his being in said cab contributed to the accident which occurred and resulted in his death, yet, if the jury further believe that said conduct upon the part of said Daniels was not the direct, immediate, and proximate cause of said accident and his death, and that the defendant could, by the exercise of ordinary care and diligence, have avoided the accident, and prevented the death of said R. Daniels, and that defendant failed to exercise and use such ordinary care and diligence to avoid said accident and prevent said killing of said R. Daniels, then the defendant is liable for said killing, and plaintiff is entitled to recover in this case."

The following instructions were given for defendant:

Instruction No. 1, given for defendant:

"The court instructs the jury that a servant entering the employment of a master assumes all the ordinary risks of such employment and service, and one of such ordinary risks so assumed by the servant is that of liability for negligence of a fellow servant in a common employment of such master."

Instruction No. 4, given for defendant:

"The court instructs the jury that, if they believe from the evidence that Robert Daniels and Frank Sweno were fellow servants in the defendant's employ, then the defend-

ant is not liable in this suit for any injury done the said Robert Daniels by the negligence of the said Sweno in discharging his duties as such fellow servant."

Instruction No. 10, given for defendant:

"The court instructs the jury that if they believe from the evidence that Frank Sweno and R. Daniels were brakemen in the employ of the defendant, and had the same duties to perform, and did the same work, for the defendant, except they run on different trains, and neither had any authority over the other, and neither had any duty to perform for the other which should have been performed by the defendant, and that the negligence of the said Sweno in the performance of his duties as such brakeman was the immediate cause of the death of said Daniels while in the discharge of his duties as such brakeman, and that the negligence of D. W. Spease, another employe of the defendant, was the remote cause of said Daniels' death, then the jury will find for the defendant."

Instruction No. 12, given for defendant:

"The court further instructs the jury that before they can find for the plaintiff in this case they must find from the evidence that the plaintiff's decedent, Robert Daniels, came to his death by reason of the negligence of the defendant, or some of its employes, who were not fellow servants of said Daniels in the defendant's employ, and that, if the jury believe that the negligence of the defendant or some of its employes was the remote cause of the death of said Daniels, and contributed to his death, and that the negligence of the said Daniels was the proximate, direct, and immediate cause of his death, then the defendant is not liable, and the jury will find for the defendant."

Instruction No. 16, given for defendant:

"The court instructs the jury that they can not in this case assess against the defendant vindictive or punitive damages; and by such 'punitive damages' is meant damages to punish the defendant for any wrong; and by 'exemplary damages' is meant damages which may be assessed to make an example of the defendant, and set it on example. Damages for neither of said purposes can be assessed against the defendant in this case."

Instruction No. 17, given for defendant:

"The court instructs the jury that in case they find for the plaintiff, they will assess plaintiff's damages at any sum, so as not to exceed ten thousand dollars, which in the judgment of the jury, may be 'just and right,' and that in assesing such damages to the plaintiff they can not take into consideration the sorrow of his relatives because of the death of R. Daniels, or the loss of his society or company from the plaintiff and his relatives, and that the true measure of damages in this case is the pecuniary loss to the estate of R. Daniels by reason of his death."

Instruction No. 18, given for defendant:

"The court instructs the jury that, in case they should find for the plaintiff, they will assess his damages at such sum as they may deem just and right, so as not to exceed ten thousand dollars and they may assess said damages at any sum under ten thousand dollars which they may deem just and right, and that in assessing such damages the true measure of the plaintiff's damage is the pecuniary damage to the estate of R. Daniels, sustained by reason of his death, and that such pecuniary damage is what should govern the jury in assessing the plaintiff's damage in this case."

Instruction No. 19, given for defendant:

"The court further instructs the jury that in assessing the damage in this case they can not take into consideration the sorrow of R. Daniels' friends and relatives because of his death, or their sorrow at his loss; nor can the jury in this case assess damages for the purpose of making an example of the defendant, or teaching the defendant a lesson."

Instructions Nos. 2 and 8, as modified by the court, and then given for defendant, are as follows:

Instruction No. 2:

"The court further instructs the jury that all servants of the same master, engaged in a common employment, and who have no authority or superiority over each other, and who are working together, and have equal opportunities to control and influence the conduct of each other, and to none of whom has been delegated the performance of any duty owing by the master to such servant, are all fellow servants in such employment."

Instruction No. 8:

"The court instructs the jury that if the defendant had in its employ one Frank Sweno as a brakeman on one of its trains, and that it was the duty of such brakeman to assist in running said train from Sewell to Hinton, and that the defendant also had plaintiff's decedent, R. Daniels, in its employ as a brakeman on another of its said trains running between said points, and that the duties of said Daniels and said Sweno were the same, and they performed the same work and were in the same service for the defendant, but on different trains, and that the negligence of said Sweno in the performance of his duty as such brakeman on his train caused the death of the said Daniels while engaged in his duties as such brakeman, and that the said Sweno had no authority over the said Daniels, and had no duty to perform, due from the defendant to said Daniels, which the said Daniels did not likewise have to perform for him, the said Sweno, and were so far working together as to be practically co-operating, and to have opportunity to control and influence the conduct of each other, and had no superiority the one over the other, then the jury will find for the defendant."

And the court refused the following instructions, asked for by the defendant:

Instruction (Refused) No. 3:

"The court instructs the jury that all brakemen in the employment of the defendant company, whether on the same or different trains, are fellow servants, and that one brakeman of the defendant can not recover damage from the defendant because of any injury sustained by him by reason of the negligence of any other brakeman in discharging his duties as such brakeman."

Instruction (Refused) No. 5:

"The court instructs the jury that the assistant yard master in the defendant's employ on its yard at Hinton and all brakemen on the defendant's trains are fellow servants."

Instruction (Refused) No. 6:

"The court further instructs the jury that, if they believe from the evidence that one Spease was employed by the defendant company as the assistant yard master on its yards

at Hinton, and that his duties as such required him to receive and take charge of all trains run on to such yards, and to overlook and care for such trains, and to have control of them while on such yards, and that plaintiff's decedent, R. Daniels, was a brakeman on one of defendant's trains, which run to and from the said yards, and that said Spease and said Daniels were both engaged in their respective positions in running and caring for defendant's trains, and that the said Spease had no authority over the said Daniels, and that the defendant had not delegated to the said Spease the performance of any duty it owed the said Daniels as its servant, then the said Spease and the said Daniels were fellow servants of the defendant; and, if the said Daniels was killed while in the service of the defendant as such brakeman by reason of the negligence of the said Spease in the performance of his duties as such assistant yard master, the defendant is not liable for the death of said Daniels, and the jury will find for the defendant."

Instruction (Refused) No. 7 :

"The court further instructs the jury that if they believe from the evidence that one Frank Sweno was in the employ of the defendant company as a brakeman on the first section of one of its freight trains, and as such brakeman it was a part of his duties to set sufficient brakes on such first section of said train before leaving it on the yards at Hinton to hold it thereon, and that he neglected such duty and failed to set any brakes on said train, and that by reason of the failure of said Sweno to set the said brakes a part of the cars in said train got loose, and ran on the main line of defendant's railway, on which main line there was another train of the defendant, about two miles below where the cars got loose, and thereby caused a collision of such other train, and in such collision the plaintiff's decedent, R. Daniels, was killed, and that at the time said R. Daniels was so killed he was on such other train in the defendant's employ as a brakeman thereon, and that the direct and immediate cause of the said collision and the said killing therein of said Daniels was the negligence of the said Sweno in failing to set the said brakes on the said first section, then the jury will find for the defendant."

Instruction (Refused) No. 9 :

"The court instructs the jury that if they believe from the evidence that Frank Sweno and R. Daniels were employed by the defendant as brakemen on its trains, and were employed as such brakemen on different trains of the defendant running between Hinton and Sewell, and that their duties as such brakemen were the same, and one had no authority over the other, and that the defendant had in its employ one D. W. Spease as an assistant yard master on its yards at Hinton, and that the duties of said Spease was to care for and look after all trains while on said yard, and that the said Spease had no control or authority over either the said Sweno or Daniels, and had no duty to perform which the defendant owed the said Daniels, and all of said parties were engaged by the defendant in handling, caring for, and running its trains on its said road, and that the said Daniels, while so employed as such brakeman, was killed by reason of the joint negligence of the said Sweno and Spease in each failing to perform his duties in his respective position, then the jury will find for the defendant."

Instruction (Refused) No. 11 :

"The court instructs the jury that if plaintiff's decedent, R. Daniels, was killed by the negligence of D. W. Spease, and that at the time said Daniel's and Spease were in the defendant's employ, and the duties of the said Daniels were those of brakeman on one of defendant's trains running between Cannelton and Hinton on defendant's railway, and the duties of the said Spease was to take the control, care, and management of defendant's trains while on its yard at Hinton, and that by reason of the carelessness of the said Spease in discharging his duties in taking care of and managing the trains and cars on said yard, certain cars got away from him, and caused the death of said Daniels, and that the death of said Daniels was caused by the negligence of said Spease, then the jury will find for the defendant, unless the jury further find that the defendant owed the said Daniels some duty which it had delegated the said Spease to perform, and which he failed to perform, and that by reason of such failure to perform such duty the

said Daniels was killed. And the jury are the judges from all the facts and evidence before them whether or not the defendant had so delegated the sad Spease to perform any duty it owed said Daniels as its servant, and, if he did fail to perform such duty, if such failure caused the said Daniel's death."

Instruction (Refused) No. 13:

"If the jury believes from the evidence that Robert Daniels was in the employ of the defendant as a brakeman on one of the freight trains, and that as such brakeman it was the duty of such Daniels to be on the cars and attending to his duty as such brakeman, and the said Daniels, in violation of the rules of the defendant, left his place as such brakeman, and went into the cab of the locomotive of such train, and by reason of his being on said locomotive received injuries which resulted in his death, then the plaintiff can not recover in this suit."

Instruction (Refused) No. 14:

"The court instructs the jury, that if they believe the plaintiff's decedent, R. Daniels, was a brakeman in the defendant's employ, and as such brakeman there was a rule of the defendant 'that prohibited the said Daniels from going into the cab of the locomotive, excepting when necessary,' and that said Daniels knew of such rule, and that he was engaged on one of defendant's trains as such brakeman, he went into the cab of the locomotive pulling such train when it was not necessary; and, further, that the said Daniels violated the said rule when he so went into said cab, and that the said Daniels was killed while so in said cab, and that the fact that the said Daniels was in said cab contributed to causing his death—then the jury can take such action of the said Daniels, in going into said cab in consideration in assessing the damages against the defendant for the death of said Daniels."

Instruction (Refused) No. 15:

"The court instructs the jury that if they believe from the evidence that the plaintiff's decedent, R. Daniels, was in the employment of the defendant as a brakeman on one of its freight trains, and that the said Daniels' place as such brakeman was at the brakes on the cars in such train, and

that said Daniels, in violation of the rules of the said defendant, left his place on said cars, and went into the cab of the locomotive pulling such train, and that the said Daniels at such time knew it was a violation of the rules of the defendant to go into said cab, and that while the said Daniels was in said cab he was injured and killed by reason of the negligence of the defendant, or its servants, and that the said Daniels being in said cab contributed to his injuries and death, then the jury may consider the said fact that said Daniels was in said cab in assessing the damage they may give in this case against the defendant, and may consider such fact in mitigation of the damages they may assess herein against the defendant."

It is not necessary to discuss the question whether the injury was the direct result of the negligence of his fellow servant—the brakeman at the yard by whose neglect to set brakes the cars escaped and ran down to Tug creek, where they were found. That was the occasion of the accident—the negligence of the yard-master in charge and conduct of the train at Tug creek was the cause, direct and proximate; so that the only real question is : Was such yard-master, under the circumstances, a vice principal of the master, or only a fellow servant of the deceased brakeman ?

Upon this point the main controversy seems to turn, and the arguments on both sides are directed to the question : What are the test or tests to be applied to the breach of duty complained of, to determine whether it is a violation of a personal duty of the master to the servant, and done by his vice principal, in which case he would be liable, or a violation of a non-personal duty, in which case he would not be liable ; because the yard-master, as · conductor, would then be a fellow servant with the deceased brakeman, and the risk of injury by him, one of the risks assumed by the brakeman as incident to the employment ?

The counsel have concentrated their arguments around four cases, treated as a group, which have attained much more than a local consideration, especially the "Madden Case." These, taken in the order of time, are *Cooper* v. *Railroad Co.*, 24 W. Va. 37 ; *Riley* v. *Railroad Co.*, 27 W. Va. 145 ; *Madden* v. *Railroad Co.*, 28 W. Va. 610 ; *Criswell*

*v. Railroad Co.,* 30 W. Va. 798 (6 S. E. Rep. 31). We are
also referred to *Hoffman* v. *Dickinson,* 31 W. Va. 142 (6 S.
E. Rep. 53); *Humphreys* v. *Newport, etc., Co.,* 33 W. Va. 135
(10 S. E. Rep. 39); and especially the case of *Railway Co.*
v. *Ross,* 112 U. S. 377 (5 Sup. Ct. Rep. 184) called the
"Ross Case." See, also, *Unfried* v. *Railway Co.,* 34 W. Va.
261 (12 S. E. Rep. 512).

We are referred to two text-books, and two only. I men-
tion them because of the reference to them, and quotations
made from them : (1) Bish. Non. Cont. Law. c. 32, "Master
and Servant, Fellow Servants," where the author, under the
subhead of "Fellow Servants," has brought together a vast
array of cases on this perplexing and tangled subject, and
within a narrow compass has treated the doctrine with his
usual orderly arrangement, and in his clear and condensed
style. I mention him now because I know his books to be
reliable, and have drawn largely on his useful labors, even
when not citing him or quoting literally. (2) The recent
work of McKinney on Fellow Servants, whose former
labors in editing and annotating Amer. & Eng. R. Cas.,
and in contributing the article on fellow servants in 7 Am.
& Eng. Enc. Law, p. 821, has well qualified him to give the
profession this useful work. See Whit. Sm. Neg. In this
day reliable text-books have become an indispensable help
to the courts as well as to the bar.

The touchstone we apply to the act of the employe to
determine whether it is the negligent act of a vice principal,
and therefore of the master, or the act of a fellow servant
of the injured party, is the nature of his duties. See Bish.
Non-Cont. Law, 665. He, who engages in the employment
of another for the performance of specified duties and ser-
vices for compensation, takes upon himself the natural
and ordinary risks and perils incident to the performance
of such services, including the perils arising from the care-
lessness and negligence of those who are in the same em-
ployment as fellow servants.

But there are certain duties which the master owes to
the servant. These he must perform in person, or by his
agent, appointed for the purpose, called a "middleman" or
"vice principal." For the breach of these duties by the

vice principal, no matter what his place or grade of service, high or low, the master is responsible to the injured servant who has not directly contributed to and in part caused the injury.

Now we have reached the test: What are these personal duties which the master owes the servant, as distinguished and set apart from the non-personal duties, which comprehend the residue, and which Dr. Bishop calls the "assignable duties?" So far these personal duties have no well-defined common earmark of an inherent kind, and so far can only be safely ascertained for practical use by enumeration and analogy; and that has produced discord. All we can say is that the personal duty depends upon its own nature, and not upon the agent or servant who performs it.

In the cases already mentioned we have for us an authoritative enumeration of most, if not all, the well-settled personal (non-assignable) duties which the master owes his servant, no matter by whom performed.

In the *Madden Case*, 28 W. Va. 610–617 (1886) Judge SNYDER, delivering the opinion, says: "The duties of the master or employer may be summed up as follows: (1) To provide safe and suitable machinery and appliances for the business (including a safe place to work.) This includes the exercise of reasonable care in furnishing such appliances, and the exercise of like care in keeping the same in repair and in making proper inspections and tests. (2) To exercise like care in providing and retaining sufficient and suitable servants for the business (and instructing those who, from newness or age, evidently need it.) (3) To establish proper rules and regulations for the service, and, having adopted such, to conform to them."

In Bish. Non-Cont. Law, § 683, the authors defines the liabilities of the master by giving connectedly and with certain qualifications the following statement of these personal duties of the master: "The doctrine is that the master is not the insurer of his servants against accident in his service; yet he owes to them the duty of carefulness to a degree reasonable in the particular instance in providing for them, and keeping in safe repair, appliances, and a safe place to work, in selecting suitable fellow servants, and in

giving the needed instruction to those who are new to the business, or of immature capacity ; and for an injury which, through negligence in this duty, comes to a servant who is not himself contributively negligent he is responsible, but not for injuries from defects in the appliances or place not discoverable on due examination, or for the negligence of carefully selected servants, or for injuries from situations and appliances the risks whereof the servant has assumed."

Again, in section 691 he says: "The leading principle around which the others cluster is that the master shall exercise in the carrying on of his business all the watchfulness over his servants, and employ all the safe-guards, which a reasonable and considerate prudence may dictate. For any violation of this duty resulting in an injury to a servant, he (the master) is answerable to him. But for casualties not traceable to any neglect or to any other wrong in the master he is not responsible."

So that we see that the doctrine of fellow servant, as far as it has gone, where no statute prevails, has been built up, we are to presume, by the application of the common-law principles of common sense, common justice, common convenience, public policy, and private right, by gathering together the points of law thus adjudged by the application of these principles to particular facts, into rules more or less general, to be applied to new cases as they arise. So that in the formative process of any branch of the law they are not mere glittering generalities incapable of useful application.

One of the best illustrations of the locality of this dividing line, as far as ascertained between the personal and remaining nonpersonal duties of the master, is furnished by the case of *Collins* v. *Railway Co.*, 30 Minn. 31 (14 N. W. Rep. 60): "If a railroad servant is injured because there is no headlight, the road is responsible; if because the headlight is not lit, it is not responsible." Bish. Non-Cont. Law, § 672. The personal duties of the master are due in supplying the ways and means and appliances, keeping them safe and in repair by constant watchfulness and supervision. The residue of his duties—the nonpersonal—relate to the execution of the work, and breaches thereof by

coservants are included in the risks incident to the employment.

This brings us to the point involved, called the "Ohio and Kentucky Doctrine," to some extent adopted (by a divided court) by the Supreme Court of the United States in the Ross Case, found also in the English "Employer's Liability Act," and in the acts of some of our States, and understood to be sanctioned and adopted in this State, especially in the *Madden Case.* This may be also regarded as cognate with the master's personal duty of superintendence. A superintendent is defined in the English act as a person whose sole or principal duty is that of superintendence, and who is ordinarily not engaged in manual labor. See McKinney, Fel. Serv. p. 226. He is what we may call the "commanding (superior) servant," and his duty is the personal duty of the master, or limitation of the master's nonpersonal duties.

The same English act enumerates these vice principals as follows: "Any person in the service of the employer who has the charge or control of any signal points, locomotive engine, or train upon a railroad." See McKinney, Fel. Serv. p. 220. In these particulars the Massachusetts act of 1887 corresponds with the English Act.

It is significant as tending to show that both regard themselves as having gone astray in holding the conductor of the railway train to be a mere fellow-servant. They put it upon no expressed ground, but impliedly upon the ground that it is the duty of the master to conduct the train in person or by agent, making a vice principal of the servant or agent who has charge or control of the locomotive engine or train upon a railroad, each making the employe thus injured not a fellow-servant *quoad* his right of recovery against the master.

This brings us to the *Ross Case* and *Madden Case.* In the *Ross Case,* 112 U. S. 377–390 (5 Sup. Ct. Rep. 184, 1884) Justice FIELD says: "A conductor having the entire control and management of a railway train occupies a very different position from the brakeman, the porters, and other subordinates employed. He is in fact, and should be treated as, the personal representative (vice principal) of the cor-

poration for whose negligence it is responsible to subordinate servants. * * * In no proper sense of the term is he the fellow servant with the fireman, the brakeman, the porters, and the engineers;" seeming to put it on the ground of control. But he returns to the duty of having a vice principal present as the only means of having the company (the master) present, regarding his presence in some way on a running train as a thing to be taken for granted. "We agree with them" (the Ohio and Kentucky coses) "in holding, and the present case requires no further decision, that the conductor of a railway train, who commands its movements, directs when it shall start, at what station it shall stop, at what speed it shall run, and has the general management of it and control over the persons employed upon it, represents the company, and therefore that for injuries resulting from his negligent acts the company is responsible." But, again returning to the idea of the personal duty of the master to be in some way present, he adds: "If such a conductor does not represent the company, then the train is operated without any representative of its owner."

The *Cooper Case,* 24 W. Va. 37 (1884) gives a full enumeration of the personal duties of the master already given; that the master can not render such duty non-personal, no matter to what servent it may delegate this duty by vesting him with controlling or superior authority in regard thereto. The negligence of such servant is the negligence of the company, giving the nature of the duty as the test of its being the personal or non-personal duty of the master, and holding that the inspector and master mechanic, charged with the duty of keeping the appliances in repair, is the vice principal of the master as to such duty, and not the fellow servant of the brakeman. But the importance of the case for the matter in hand is the distinct personal duty of the master to exercise continued supervision over the appliances, and to keep them in good and safe repair, which of course implies the presence in some way of the master.

In *Riley's Case,* 27 W. Va. 145, the Court still deals with the performance of some personal duty of the master by

some superintendent, foreman, or other employe of the company; a duty "which the master has impliedly contracted, or which rests upon him as an absolute duty." Here the master's personal duty of continued supervision and to keep the road and running stock in good and safe repair and condition is this time applied to the railway and track for the use of its employes. The brakeman on a train consisting of one engine and tender was struck by a stump standing by the side of the railway. It was the negligence of a foreman who was intrusted with the personal duty of the master of keeping the road in repair.

The *Criswell Case,* found in 30 W. Va. 798 (6 S. E. Rep. 81) was decided in 1888. Here the plaintiff's intestate who received the injury was at work for defendant in repairing defendant's railroad, and when killed was on a hand car, going to the place of work. Foutz was his foreman in repairing the track, who stood in the place of the master in controlling and discharging those working under him. It was by his negligence that the deceased was injured. In the opinion the liability is placed on the ground of the *Madden Case :* "That two servants of the same master are not fellow servants when one acts in a superior capacity to the other in regard to some duty of the master." There was collision of a hand car on the track, moving under the control of the foreman, with an extra train, by the negligence of such foreman, which caused the death of plaintiff's intestate. Here the foreman was in fact clothed by the master with the power to perform its duties to the servant injured, and the power conferred on the foreman was determined by the rules of the company.

We now return to our leading case upon the point here involved—*Madden* v. *Railway Co.,* 28 W. Va. 610 (1886). An engineer upon one train of a railway company was injured by the negligence of a conductor of another train running in an opposite direction. Held, the engineer is not the fellow servant of said conductor. The Court put it distinctly on the ground that the conductor, in controlling and running his train, is the vice principal of the master; and the master is liable for injury to its servants, caused by the negligence of the conductor in running and conducting

its train. But SNYDER, J., delivering the opinion of the Court, on page 618 says: "The rule deduced from these principles and authorities would seem to be that two servants of the same master are not fellow servants when one acts in a superior capacity to the other in regard to some duty due from the master; and the master is liable for any injuries to the subordinates caused by the carelessness or negligence of the superior."

Reading the headnote as given above with this deduction given in the body of the opinion, the conclusion may be drawn that the conductor in control of the railway train is, as to certain duties, the vice principal of the master, and not the fellow servant of the brakeman and other employes of the common master. The negligence in this case was by negligently obstructing the track with his own train, so as to cause a collision with another train, causing the injury of its engineer.

We have now looked briefly at the *Ross Case,* and at the group of which the *Madden Case,* may be regarded as the center, severally and separately, with reference to their peculiar bearing on the case in hand. Before I go back and put together the details I have been in search of, and put into juxtaposition this group represented by the *Madden Case,* and the *Ross Case,* I wish to preface it ₐwith a matter of common observation.

I have seen a few among the very many criticisms on the *Ross Case.* The leading one is based not on a denial of one of the principles impliedly put by the majority at the bottom of the ruling, but upon a misapplication of it, based upon a mistake, it is said, in the matter of common observation. It is a matter of common observation—the care they take (the railway company) the extreme and continual care and watchfulness, to make and keep the way safe before the coming and going trains. The moving train and the way are by eminence, literally as well as in figure of speech, "the ways and the means" to which their personal, as distinguished from their general non-personal energies and efforts are directed.

In the *Cooper Case,* the first of the group, the learned judge in his opinion takes continual supervison and watch-

fulness as the keynote of the railway company's duty in regard to the appliances. The common-law rule is not tied down and hampered by a fixed phraseology, so that time need not be wasted in quibbling over words; but that is within the rule which is within the meaning of the rule, and the meaning is determined by common reason and common justice. In a word, the spirit is not killed by the letter. Hence, in the *Madden Case*, the safe way as well as the safe appliances was adjudged to be within the rule requiring continued supervision and watchfulness.

Dr. Bishop, as any one familiar with his method may see who will take the time and trouble to examine with some care his chapter on fellow servants, entered the maze of fellow servant cases, and marshalled them over and over again to find the leading string, and a test of a rule which would not offend our common reason and our common sense of right and wrong, which would do right by the company, the master, as well as by the servant. His last word upon the subject is: "Watchfulness of ways and appliances is the central duty around which cluster all the personal (non-assignable) duties due the servant from the master."

Returning now to the *Ross Case* and *Madden Case*, and leaving out of view the reason of the rule as resting alone on the fact of superiority and subordination in control, if we take the facts of the case and the reason given impliedly by Justice FIELD and by Justice MILLER (a venerable name, we may now say) and others who concurred, we find it to be the duty of constant watchfulness of the way and appliances, especially at the moving time and place, at the very moment of its supreme importance, when the great danger to the appliance was the running of it, and the great danger of the serious obstruction of the way was from the trains themselves, monsters of power moving with a momentum of five hundred tons and more, multiplied by more than the speed of the race horse, and a fearful obstruction to encounter when standing still, or when, as in these two cases, they were running together, one or both out of time or out of place by the fault of somebody.

Justice FIELD seems to take it as a concession that in

these supreme needs of watchfulness and care as they arose from second to second in passing time, and from foot to foot in change of place, the master was surely present; and, if present, why not select the conductor as the one in control as his personal representative, and, in subordination to to him, the engineer, too, if need be, both helping for the occasion, together with the operator at the distance, in the constant careful watchfulness in general; the one with his cunning hand on the lever, and his steady eye to the front; the other, passing through the appliances from end to end constantly. And Judge SNYDER, in the *Madden Case*, and Judge GREEN, quoting it with approval in the *Criswell Case*, held the conductor to be the one in authority, discharging the personal duty of the master, and by that test also, as well as by the test of "superior servant," the doctrine of fellow servant did not come into play. In both cases there was negligence; in the *Ross Case* on both trains. Justice FIELD takes the negligence found on the going train, and restricts the headnote to that. Judge SNYDER applies it in effect to both.

This brings us to the case in hand, the facts of which do not require for the solution of the point of law involved that we shall put the rule of the *Madden Case* upon the one ground or the other—superiority in isolated commands, or the nature of the duty to be discharged. Both existed in the *Madden Case*, as there held, and both exist here. Whether we call the yard master a conductor simply, or a conductor *pro hac vice*, is not important. He was on the ground in command of the train. It was his duty to remove it, as dangerously barring the way of the coming train which he knew must be close at hand; and to warn and give notice of the dangerous obstruction to the expected train, according to the rules.

We have already shown, and it is not necessary to repeat, the railway master can not, by the requirement of its rules, shift the burden of a personal duty to other shoulders, and thus make the doctrine of fellow servant apply, because it has no power to amend the general law. How far it may be regulated by contract, express or implied, the facts of this case do not require us to inquire. This, I take it, is the

least settled of all.   See Bish. Non-Cont. Law, § 674.   "If in words or by implication the servant has undertaken to assume a risk, he can not have compensation of the master for an injury resulting therefrom."

In the case of *Railway Co.* v. *Spangler*, 44 Ohio St. 471 (8 N. E. Rep. 467) OWEN, C. J., says: "The policy of our law (as to the superior servant rule) being well settled, it only remains for us to inquire whether the railroad companies may ignore or contravene that policy by private compact with their employes, stipulating that they (the railway company shall not be held to a liability for the negligence of their servants which public policy demands shall attach to them.   The answer is obvious.   Such liability is not created for the protection of the employes simply, but has its reason and its foundation in public necessity and policy, which should not be asked to yield or surrender to mere private interests and agreements."

This brings us to the instructions respectively given and refused.

Plaintiff's instruction No. 1.   This instruction states hypothetically and correctly, what the evidence certified tended to prove, with the rule of the *Madden Case* correctly applied.

Plaintiff's Instruction No. 2.   This proceeds upon the supposition, and the facts and nature of the circumstances show the facts supposed to be true—that if plaintiff's intestate had been right at his brake, he could not possibly have prevented the collision; and that, if the fact, that he was out of place, did not directly contribute to the injury, then plaintiff's right to recover, if any, was not thereby barred.   This is the law, as laid down in the *Riley Case*, 27 W. Va. 145, and in many other cases.

Defendant's Instruction No. 1.   This was properly given for defendant, and there is no one to complain.

Defendant's instruction No. 2.   This was properly refused, because it is not in accordance with the law laid down in the *Madden Case;* and, if the court ¶in that case put the master's liability not upon the single fact, that the conductor of the train as such was performing a personal duty of the master as the superior in control, but also required that the conductor should be in discharge of some other personal duty, then it at the same time held that, so far as by

running his train he obstructed the track to the hurt of another and subordinate servant, he was, as vice principal *pro hac vice*, in discharge of the master's duty of watchfulness and care in keeping the track clear. Besides, the instruction given by the court in amendment of No. 2 was all that defendant could ask on this head.

Defendant's instruction No. 3. This instruction may or may not be correct, and it was properly rejected, there being no evidence fairly tending to show that the injury directly and proximately resulted from the negligence of the other brakeman; and, even if it did, it did not do so without the direct, intervening, proximate help of the negligence of the conductor.

Defendant's Instruction No 4. This is No. 3 in another form.

Defendant's Instruction No. 5. This is abstract in one view and incorrect in the other, as already shown.

Defendant's Instruction No. 6. In the *Madden Case* the engineer on one train was injured by the negligence of the conductor of another train.

Defendant's Instruction No. 7. This in one part assumes the fact in dispute—that the negligence of the other brakeman caused the collision—while the evidence shows that it was but the occasion; nor is there any evidence tending to show that it was the cause.

Defendant's Instruction No. 8. This instruction is based on the theory that the negligence of the brakeman on the other train was the one direct, efficient, proximate cause of the injury. It was properly refused as abstract if for no other reason; and, as amended by the court, and then given, defendant has no ground to complain of it.

Defendant's Instruction No. 9. This is based on the theory, that upon the facts, such as there was evidence tending to prove, the two brakemen and the conductor were fellow servants. If there had been any evidence tending to support this theory, it would have been enough, whether the transgressors acted jointly or severally.

Defendant's Instruction No. 10. This has been already disposed of. There is no evidence tending to show that the negligence of the other brakeman was the immediate cause of the death of plaintiff's intestate, and the negligence of

Spease, the conductor, the remote cause. The tendency of all the evidence is to show the reverse.

Defendant's Instruction No. 11. The uncontradicted evidence shows that it was the duty of Yard Master Spease to take and conduct a train down to Tug creek, and bring back the runaway cars ; and that brings him, for at least the only occasion here material, within the rule in the *Madden Case.* The latter clause of this instruction may have been correct, but it need not be examined, because the court was not asked to consider it separately.

Defendant's Instruction No. 12. The ground of the first branch of this instruction was sufficiently covered by instruction No. 1 given for plaintiff, and that of the second branch by plaintiff's instruction No. 2.

Defendant's Instruction No. 13. This instruction, also on contributory negligence, was covered in a practical, concrete way by instruction No. 2 given for plaintiff.

Defendant's Instruction No. 14. The evidence shows affirmatively that the death of the brakeman on the coming train was not caused contributorily or otherwise by Daniel's violation of any rule, whether he knew it or not, but by the negligence of the conductor in not observing the rule which required him to give Daniel's expected train warning that the track was obstructed by his, the conductor's, own train.

Defendant's Instruction No. 15. This was properly disposed of by instruction No. 2 given for plaintiff, which covered the same point of law, which has been held to be correct in substance. Besides it is abstract, there being no evidence that the brakeman's own conduct contributed in any degree to his death.

Defendant's Instructions Nos. 16, 17, 18, and 19 were given. If either of them should happen to be wrong in any particular—they seem to be correct—plaintiff is not to blame for it.

In conclusion, although counsel should have full liberty to manage their cases in their own way, present all points of law for instruction that may arise, and the same point in different phases out of abundant caution, still they should consider that the time of the Circuit Court is precious, and

that too much caution of this sort might tire out the most patient temper.

JUDGMENT AFFIRMED.